Opinion
KENNARD, J.
The Sixth Amendment of the United States Constitution grants a criminal defendant the right to confront adverse witnesses. That right is at issue in a trio of cases before us. (The two companion cases are People v. Dungo (2012) 55 Cal.4th 608 [147 Cal.Rptr.3d 527, 286 P.3d 442], and People v. Rutterschmidt (2012) 55 Cal.4th 650 [147 Cal.Rptr.3d 518, 286 P.3d 435].) Each involves the constitutionality of a prosecution expert’s testimony about certain information in a report prepared by someone who did not testify at trial.
Here, defendant Virginia Hernandez Lopez was charged with vehicular manslaughter while intoxicated (Pen. Code, § 191.5, subd. (b)), after her vehicle collided with another, killing its driver. To prove intoxication, the prosecution at trial introduced into evidence a laboratory analyst’s report on the percentage of alcohol in a blood sample taken from defendant two hours after the accident. The analyst did not testify, but a colleague did. A jury found defendant guilty as charged. The Court of Appeal reversed, holding that admission of the nontestifying analyst’s laboratory report and the colleague’s testimony relating some of the report’s contents violated defendant’s right to confront and cross-examine the report’s author. Because we disagree with that holding, we reverse the Court of Appeal.
I
A. Prosecution’s Evidence at Trial
On the evening of August 18, 2007, defendant was working at a restaurant in Julian, San Diego County. Three times that evening, the restaurant’s bartenders served defendant single shots of tequila; the first at 8:30 p.m. (during her work shift), the other two between 9:45 p.m. (when her shift *574 ended) and 10:15 p.m. Shortly before 11:00 p.m., defendant left in her sport utility vehicle (SUV). On a narrow, curving road, the SUV struck the driver’s side of a pickup truck traveling in the opposite direction, killing the driver, Allan Wolowsky. Defendant was seriously injured; while being airlifted to a hospital, she told an emergency medical technician that she had had “a couple of drinks” at work, that she had been driving “really fast,” and that she had lost control of her SUV. At the hospital, at 1:04 a.m. (approximately two hours after the accident), two vials of blood were drawn from defendant for testing.
At defendant’s jury trial, criminalist John Willey of the San Diego County Sheriff’s Regional Crime Laboratory testified that he had reviewed a laboratory report by his colleague, Jorge Peña, who had analyzed defendant’s blood sample. (As noted earlier, Peña did not testify; the prosecution did not assert that Peña was unavailable as a witness.) Willey mentioned that, as described in Peña’s report, Peña had used a gas chromatograph to analyze defendant’s blood sample. The report, Willey testified, stated that defendant’s blood sample contained a blood-alcohol concentration of 0.09 percent.[1] Willey added that based on his own “separate abilities as a criminal analyst,” he too concluded that the blood-alcohol concentration in defendant’s blood sample was 0.09 percent.
Willey had been in the laboratory’s employ for more than 17 years and knew its “procedures for processing blood samples for alcohol analysis.” Willey explained that he had trained Peña and was “intimately familiar with [Peña’s] procedures and how [Peña] tests [blood for] alcohol,” and that “each of the people who work[] at the lab is trained to process blood alcohol analysis in the same manner.” At the prosecution’s request, the trial court admitted into evidence a copy of Peña’s laboratory report. Defendant objected to the report’s admission as well as to Willey’s testimony about its contents.
Toxicologist John Treuting testified that a person with a blood-alcohol level of 0.09 percent two hours after a collision who had consumed no alcohol during those two hours would at the time of the accident have been *575 intoxicated (see p. 574, fn. 1, ante), with a blood-alcohol level of 0.12 percent. Treuting said that if, as the restaurant’s bartenders testified, defendant had only a single shot of tequila about three and a half hours before the accident and two more single shots of tequila between 45 and 90 minutes before the accident, defendant’s blood-alcohol level should have been only around 0.04 percent. Treuting added that the 0.12 percent level might have been achieved if defendant had double shots of tequila instead of the single shots to which the bartenders testified.
Two California Highway Patrol officers who had investigated the fatal collision testified about its cause: After defendant had veered onto the right-hand shoulder of the narrow road, she “overcorrected” and drove into the oncoming lane, colliding with Wolowsky’s pickup truck.
Accident reconstruction expert Ernest Phillips testified that defendant had been driving between 68 and 75 miles per hour, and that after drifting onto the right shoulder of the road, she steered to the left into oncoming traffic, causing the collision. Phillips attributed the accident to defendant’s speed, intoxication, and inattention.
B. Defense Evidence at Trial
Defendant testified that after finishing her work shift at the restaurant on the night of the accident, she and coworker Jorge Acosta each had two shots of tequila at the restaurant. Thereafter, defendant said, she left in her car, driving between 50 and 55 miles per hour; after rounding a curve, she saw a car’s high-beam lights approaching her in her lane; she became scared and steered a little to the right; she could not remember what happened after that. Co worker Acosta corroborated defendant’s testimony about drinking only two shots of tequila. Accident reconstruction expert Stephen Plourd agreed with defendant about the speed of her SUV at the time of the fatal collision. Dr. Ian McIntyre, the manager of the San Diego County Medical Examiner’s forensic toxicology laboratory, testified that at the time of the accident Wolowsky, the driver of the other car, was intoxicated, with a blood-alcohol level of 0.11 percent.
C. Verdict and Appeal
The jury convicted defendant of vehicular manslaughter while intoxicated, as charged, and the trial court sentenced her to two years in prison. The Court of Appeal affirmed the trial court’s judgment. Thereafter, we granted defendant’s petition for review and ordered the case transferred to the Court of Appeal for reconsideration in light of Melendez-Diaz v. Massachusetts (2009) 557 U.S. 305 [174 L.Ed.2d 314, 129 S.Ct. 2527] (Melendez-Diaz), which the *576 United States Supreme Court had decided six weeks after the Court of Appeal’s decision. On reconsideration, the Court of Appeal reversed the judgment of conviction; it held that admitting nontestifying analyst Peña’s laboratory report into evidence and permitting criminalist Willey to testify about the report’s contents violated defendant’s right to confront Peña at trial. We granted the Attorney General’s petition for review.
II
As we stated earlier, the Sixth Amendment to the federal Constitution gives a criminal defendant the right to confront and cross-examine adverse witnesses. In Ohio v. Roberts (1980) 448 U.S. 56, 66 [65 L.Ed.2d 597, 100 S.Ct. 2531], the United States Supreme Court construed that right as allowing the admission at trial of an out-of-court statement if it fell within a “firmly rooted hearsay exception” or had “particularized guarantees of trustworthiness.” The high court overruled that decision 24 years later, in Crawford v. Washington (2004) 541 U.S. 36 [158 L.Ed.2d 177, 124 S.Ct. 1354] (Crawford). There, the court created a general rule that the prosecution may not rely on “testimonial” out-of-court statements unless the witness is unavailable to testify and the defendant had a prior opportunity for cross-examination. (Id. at p. 59.)
Although the high court in Crawford did not define the term “testimonial,” it made these observations: “[T]he Confrontation Clause . . . applies to ‘witnesses’ against the accused—in other words, those who ‘bear testimony.’ [Citation.] ‘Testimony,’ in turn, is typically ‘[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.’ [Citation.] An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not. . . . [][] Various formulations of this core class of ‘testimonial’ statements exist: ‘ex parte in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially,’ [citation]; ‘extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions,’ [citation]; ‘statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial,’ [citation].” (Crawford, supra, 541 U.S. at pp. 51-52.) Some three years later, in People v. Geier (2007) 41 Cal.4th 555 [61 Cal.Rptr.3d 580, 161 P.3d 104] (Geier), we addressed the Crawford holding.
In Geier, a laboratory director—relying on a laboratory report prepared by a nontestifying analyst—testified at the defendant’s trial that DNA *577 found on vaginal swabs taken from the murdered rape victim matched the defendant’s DNA. We unanimously rejected the defendant’s argument that the report was testimonial. We said: “[A] statement is testimonial if (1) it is made ... by or to a law enforcement agent and (2) describes a past fact related to criminal activity for (3) possible use at a later trial. Conversely, a statement that does not meet all three criteria is not testimonial.” (Geier, supra, 41 Cal.4th at p. 605.) Under that test, Geier concluded, the report of the nontestifying laboratory analyst was not testimonial and thus admissible, because it was “a contemporaneous recordation of observable events rather than the documentation of past events” related to criminal activity. (Ibid.)
Since then, the high court has in three cases applied its Crawford holding—that “[testimonial statements of witnesses absent from trial” are ordinarily admissible “only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine” (Crawford, supra, 541 U.S. at p. 59)—to documents reporting the laboratory findings of nontestifying analysts. Those post-Crawford cases are Melendez-Diaz, supra, 557 U.S. 305; Bullcoming v. New Mexico (2011) 564 U.S._[180 L.Ed.2d 610, 131 S.Ct. 2705] (Bullcoming)-, and Williams v. Illinois (2012) 567 U.S. _[183 L.Ed.2d 89, 132 S.Ct. 2221] (Williams).
In Melendez-Diaz, the defendant was charged in Massachusetts with cocaine distribution and trafficking. As permitted under Massachusetts law, the prosecution introduced into evidence three “ ‘certificates of analysis’ ” (Melendez-Diaz, supra, 557 U.S. at p. 308), each prepared by a laboratory analyst and sworn before a notary public; these laboratory certificates stated that a substance found in plastic bags in the defendant’s car was determined to be cocaine. The defendant was convicted of the charges. A Massachusetts appellate court held that the trial court’s admission of the certificates did not violate the defendant’s right to confront and cross-examine the nontestifying laboratory analysts who had done the testing; the Supreme Judicial Court of Massachusetts denied review. (Id. at p. 309.)
Thereafter, in a five-to-four decision, the United States Supreme Court held that the laboratory certificates in Melendez-Diaz fell “within the ‘core class of testimonial statements’ ” (Melendez-Diaz, supra, 557 U.S. at p. 310), and thus were inadmissible under Crawford, supra, 541 U.S. 36. The court observed that each certificate was (1) “a ‘ “solemn declaration or affirmation made for the purpose of establishing or proving some fact” ’ ” (Melendez-Diaz, supra, at p. 310), (2) “functionally identical to live, in-court testimony” (id. at pp. 310-311), (3) “ ‘ “made under circumstances which would lead an objective witness reasonably to believe that [it] would be available for use at a later trial” ’ ” (id. at p. 311), and (4) created “to provide ‘prima facie evidence of the composition, quality, and the net weight’ ” (ibid.) of the substance found in the plastic bags seized from the defendant’s car.
*578 Justice Thomas, who signed the majority opinion in Melendez-Diaz, wrote separately to express his view that “ ‘the Confrontation Clause is implicated by extrajudicial statements only insofar as they are contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions.’ ” (Melendez-Diaz, supra, 557 U.S. at p. 329 (cone. opn. of Thomas, J.), italics added.) Because the laboratory certificates at issue were affidavits, Justice Thomas concluded, their use against the defendant violated his confrontation right. (Id. at p. 330 (cone. opn. of Thomas, J.).)
Two years later, in 2011, the high court decided Bullcoming, supra, 564 U.S._ [131 S.Ct. 2705]. In that case, a New Mexico defendant was charged with driving while intoxicated. As permitted under New Mexico law, the prosecution introduced at trial a laboratory analyst’s certificate stating that a blood sample taken from the defendant shortly after his arrest contained an illegally high level of alcohol. That analyst did not testify. Instead, the prosecution called as a witness another analyst who had “neither participated in nor observed the testing.” (Id. at p._[131 S.Ct. at p. 2709].) The New Mexico Supreme Court affirmed the judgment of conviction, holding that the admission at trial of the nontestifying analyst’s laboratory certificate did not violate the defendant’s confrontation right.
The United States Supreme Court in Bullcoming disagreed, in a five-to-four decision. It noted that, unlike the laboratory certificates at issue in Melendez-Diaz, supra, 557 U.S. 305, the analyst who prepared the certificate admitted in Bullcoming did not swear before a notary public that its contents were true. Nevertheless, the court said, the certificate was “ ‘formalized’ in a signed document” that made reference to New Mexico court rules providing “for the admission of certified blood-alcohol analyses.” (Bullcoming, supra, 564 U.S. at p._[131 S.Ct. at p. 2717].) These “formalities” (ibid.) were, in the court’s view, “more than adequate” (ibid.) to qualify the laboratory certificate in Bullcoming as testimonial, and hence inadmissible. The high court in Bullcoming concluded: “Because the New Mexico Supreme Court permitted the testimonial statement of one witness [(the laboratory analyst who tested the defendant’s blood sample)] through the in-court testimony of a second person [(the expert familiar with the laboratory’s testing procedures)] we reverse that court’s judgment.” (Id. at p. __[131 S.Ct. at p. 2713].)
Then, last June, came the high court’s decision in Williams, supra, 567 U.S. _[132 S.Ct. 2221], In Williams, a Chicago woman was kidnapped, robbed, and raped. Vaginal swabs taken from the woman were sent to the Illinois State Police (ISP) Crime Laboratory; semen was found on the swabs, which were then sent to the Cellmark Diagnostic Laboratory in the State of Maryland. At the defendant’s trial (before a judge, not a jury), ISP forensic biologist Sandra Lambatos, the prosecution’s expert witness, testified that *579 Cellmark analysts had tested the vaginal swabs, derived a DNA profile of the man whose semen was on the swabs, and sent ISP a laboratory report containing that profile. In the expert’s opinion, the Cellmark DNA profile matched the ISP’s DNA profile, which had been derived from a blood sample taken from the defendant when he was arrested for an unrelated offense. At trial, the Cellmark laboratory report was not introduced into evidence, and no Cellmark analyst testified. The defendant was convicted. The Illinois Appellate Court and the Illinois Supreme Court affirmed the judgment. Both courts stated that the prosecution expert’s testimony about the Cellmark report was not offered for the truth of the matter asserted in the report, but only to explain the basis of the expert’s opinion finding a match between the ISP laboratory’s DNA profile and the Cellmark laboratory’s DNA profile.
In Williams, supra, 567 U.S. _ [132 S.Ct. 2221], four justices of the United States Supreme Court found common grounds for the conclusion that the expert’s testimony did not violate the Sixth Amendment’s confrontation right, one justice wrote separately expressing agreement with that conclusion but for very different reasons, and four justices through a single dissenting opinion concluded that the defendant’s confrontation right was violated. Below is a summary of the various views.
Justice Alito wrote a plurality opinion that was signed by Chief Justice Roberts as well as Justices Kennedy and Breyer; in a separate concurring opinion Justice Breyer explained why he joined Justice Alito’s opinion “in full” (Williams, supra, 567 U.S. at p._[132 S.Ct. at p. 2252] (cone. opn. of Breyer, J.)). The plurality opinion observed: “Out-of-court statements that are related by the expert solely for the purpose of explaining the assumptions on which that opinion rests are not offered for their truth and thus fall outside the scope of the Confrontation Clause. Applying this rule to the present case, we conclude that the expert’s testimony did not violate the Sixth Amendment.” (Id. at p. _ [132 S.Ct. at p. 2228] (plur. opn. of Alito, J.).) Alternatively, Justice Alito’s plurality opinion stated, even if the expert’s testimony had been admitted for the truth of the matter asserted in the Cellmark laboratory’s report, the report was not testimonial (and hence the expert’s testimony about the report was admissible) because it was not prepared “for the primary purpose of accusing a targeted individual.” (Id. at p._[132 S.Ct. at p. 2243] (plur. opn. of Alito, J.).) Indeed, the plurality noted, the defendant was not yet a suspect at the time the report was produced. (Ibid.)
In a separate opinion, Justice Thomas concurred in the plurality’s conclusion that no violation of the defendant’s confrontation right occurred, but he used different reasoning, which no other justice endorsed. Unlike Justice Alito’s plurality opinion, Justice Thomas perceived “no plausible reason for *580 the introduction of Cellmark’s statements other than to establish their truth.” (Williams, supra, 567 U.S. at p. _ [132 S.Ct. at p. 2256] (conc. opn. of Thomas, J.).) Justice Thomas also rejected the plurality’s reasoning that the Cellmark laboratory’s report was not testimonial because it was prepared mainly to find a yet-unidentified rapist. That rationale, Justice Thomas said, “lacks any grounding in constitutional text, in history, or in logic.” (Id. at p._[132 S.Ct. at p. 2262] (conc. opn. of Thomas, J.).) Although Justice Thomas agreed with the plurality that the Cellmark report was not testimonial, he reached that conclusion by a completely different route. In his words; “I agree with the plurality that the disclosure of Cellmark’s out-of-court statements through the expert testimony of Sandra Lambatos did not violate the Confrontation Clause . . . solely because Cellmark’s statements lacked the requisite ‘formality and solemnity’ to be considered ‘ “testimonial” ’ for purposes of the Confrontation Clause.” (Id. at p._[132 S.Ct. at p. 2255] (conc. opn. of Thomas, J.), italics added.)
Justice Kagan’s dissenting opinion, which was signed by Justices Scalia, Ginsburg, and Sotomayor, took the view that ISP biologist Lambatos’s testimony about the Cellmark laboratory’s report containing the DNA profile resulted in a violation of the defendant’s right to confront the Cellmark analysts who had produced the report. Like Justice Thomas in his concurrence, the dissent rejected the Williams plurality’s conclusion that Lambatos’s testimony about the report was not admitted for the truth of the matters asserted in the report. (Williams, supra, 567 U.S. at p. _ [132 S.Ct. at p. 2268] (dis. opn. of Kagan, J.) [“. . . Lambatos’s statements about Cellmark’s report went to its truth . . . .”].) And like Justice Thomas the dissent rejected the plurality’s alternative conclusion that the Cellmark laboratory report was not testimonial because it was primarily prepared not to accuse a targeted suspect but to catch an unidentified rapist still at large. The dissent echoed Justice Thomas’s criticism of the plurality’s reasoning as devoid of support in either the text or the history of the Sixth Amendment’s confrontation right. (567 U.S. at p._[132 S.Ct. at p. 2274] (dis. opn. of Kagan, J.).) But the dissent then criticized Justice Thomas for concluding that the Cellmark laboratory report was not testimonial because, as Justice Thomas stated, it was neither a sworn nor a certified declaration of fact. That view, the dissent stated, “grants constitutional significance to minutia, in a way that can only undermine the Confrontation Clause’s protections.” (Id. at p._[132 S.Ct. at p. 2276] (dis. opn. of Kagan, J.).)
III
As noted in the preceding part, the United States Supreme Court has said that generally the Sixth Amendment’s confrontation right bars the admission at trial of a testimonial out-of-court statement against a criminal defendant *581 unless the maker of the statement is unavailable to testify at trial and the defendant had a prior opportunity for cross-examination. (See p. 576, ante.) Here, declarant Jorge Peña, whose laboratory report on the concentration of alcohol in defendant’s blood two hours after the fatal accident was introduced into evidence by the prosecution, was not unavailable as a witness and defendant had no previous opportunity to cross-examine him. Was Peña’s laboratory report testimonial and thus inadmissible? We explore that issue below.
Under this court’s 2007 decision in Geier, which considered the United States Supreme Court’s 2004 decision in Crawford, supra, 541 U.S. 36 (see pp. 576-577, ante), here nontestifying analyst Peña’s laboratory report would not be testimonial, and hence would be admissible at trial, because the report was a “contemporaneous recordation of observable events” (Geier, supra, 41 Cal.4th at p. 606) rather than a description of “a past fact related to criminal activity” {id. at p. 605). But two years later the high court in Melendez-Diaz said that a laboratory report may be testimonial, and thus inadmissible, even if it “ ‘contains near-contemporaneous observations of [a scientific] test’ ” (Melendez-Diaz, supra, 557 U.S. at p. 315; see Bullcoming, supra, 564 U.S. at pp. - [131 S.Ct. at pp. 2714-2715]).
To resolve the difficult issue here, we look to the United States Supreme Court’s 2004 decision in Crawford; the 2009 decision in Melendez-Diaz, supra, 557 U.S. 305; the 2011 decision in Bullcoming, supra, 564 U.S._ [131 S.Ct. 2705]; and this year’s decision in Williams, supra, 567 U.S._ [132 S.Ct. 2221], Under this quartet of cases, which we summarized in the preceding part, the prosecution’s use at trial of testimonial out-of-court statements ordinarily violates the defendant’s right to confront the maker of the statements unless the declarant is unavailable to testify and the defendant had a prior opportunity for cross-examination. Although the high court has not agreed on a definition of “testimonial,” a review of the just-mentioned four decisions indicates that a statement is testimonial when two critical components are present.
First, to be testimonial the out-of-court statement must have been made with some degree of formality or solemnity. (See Crawford, supra, 541 U.S. at p. 51 [“An accuser who makes a formal statement to government officers bears testimony . . . .”]; Melendez-Diaz, supra, 557 U.S. at p. 310 [stressing that each of the laboratory certificates determined to be testimonial was “a ‘ “solemn declaration or affirmation” ’ ”]; Bullcoming, supra, 564 U.S. at p._[131 S.Ct. at p. 2717] [the laboratory certificate found to be testimonial was “ ‘formalized’ in a signed document” that “referred] to . . . rules” that made the document admissible in court (citation omitted)]; see also Davis v. Washington (2006) 547 U.S. 813, 830, fn. 5 [165 L.Ed.2d 224, *582 126 S.Ct. 2266] [“formality is indeed essential to testimonial utterance”].) The degree of formality required, however, remains a subject of dispute in the United States Supreme Court. (See, e.g., Williams, supra, 567 U.S. at p._ [132 S.Ct. at p. 2260] (cone. opn. of Thomas, J.) [laboratory report lacked formality because it was “neither a sworn nor a certified declaration of fact”]; id. at p._[132 S.Ct. at p. 2276] (dis. opn. of Kagan, J.) [rejecting Justice Thomas’s view of formality as granting “constitutional significance to minutia”].)
Second, all nine high court justices agree that an out-of-court statement is testimonial only if its primary purpose pertains in some fashion to a criminal prosecution, but they do not agree on what the statement’s primary purpose must be. For instance, in this year’s Williams decision, Justice Alito’s plurality opinion said that the Cellmark laboratory’s report at issue was not testimonial because it had not been prepared “for the primary purpose of accusing a targeted individuar (Williams, supra, 567 U.S. at p._[132 S.Ct. at p. 2243] (plur. opn. of Alito, J.), italics added). Justice Thomas’s concurring opinion criticized that standard, describing it as lacking “any grounding in constitutional text, in history, or in logic.” (Id. at p. _ [132 S.Ct. at p. 2262] (cone. opn. of Thomas, J.).) Instead, for Justice Thomas, the pertinent inquiry is whether the statement was “primarily intended] to establish some fact with the understanding that [the] statement may be used in a criminal prosecution.” (Id. at p._[132 S.Ct. at p. 2261] (cone. opn. of Thomas, J.).) And under the Williams dissent, the pertinent inquiry is whether the report was prepared “for the primary purpose of establishing ‘past events potentially relevant to later criminal prosecution’—in other words, for the purpose of providing evidence.” (Id. at p. _ [132 S.Ct. at p. 2273] (dis. opn. of Kagan, J., joined by Scalia, Ginsburg, and Sotomayor, JJ.)
Here, we need not consider the primary purpose of nontestifying analyst Peña’s laboratory report on the concentration of alcohol in defendant’s blood because, as explained below, the critical portions of that report were not made with the requisite degree of formality or solemnity to be considered testimonial (see pp. 581-582, ante).
Peña’s laboratory report consists of six pages. The first page, described by testifying analyst John Willey as a “chain of custody log sheet,” is a chart showing the results of nine blood samples that Peña tested on August 31, 2007. One of the nine was defendant’s blood sample, which was given laboratory No. 070-7737. (We describe the report’s first page in greater detail below.) The report’s second page is a printout of a gas chromatography machine’s calibrations on the day of the test. Pages 3 and 6 of the report were described in Willey’s trial testimony as “quality control [runs] before and *583 after the subject samples.” Pages 4 and 5 of the report show two computer-generated numerical results (0.0906 and 0.0908) of two laboratory analyses of blood sample No. 070-7737 (defendant’s blood sample).
Turning first to the laboratory report’s pages 2 through 6, they consist entirely of data generated by a gas chromatography machine to measure calibrations, quality control, and the concentration of alcohol in a blood sample. Even though nontestifying analyst Peña’s signature appears on the laboratory report’s second page (the printout of the machine’s calibrations) and the remaining pages bear the handwritten initials “JRP” (presumably Jorge Peña’s initials), no statement by Peña, express or implied, appears on any of those pages.
Not yet considered by the United States Supreme Court is whether the prosecution’s use at trial of a machine printout violates a defendant’s right to confront and cross-examine the machine’s operator when, as here, the printout contains no statement from the operator attesting to the validity of the data shown. We agree with those federal appellate courts that have upheld the use of such printouts. (See U.S. v. Moon (7th Cir. 2008) 512 F.3d 359, 362 [“the instruments’ readouts are not ‘statements’, so it does not matter whether they are ‘testimonial’ ”]; U.S. v. Washington (4th Cir. 2007) 498 F.3d 225, 231 [“the raw data generated by the machines do not constitute ‘statements,’ and the machines are not ‘declarants’ ”]; see also Bullcoming, supra, 564 U.S. at p._[131 S.Ct. at p. 2722] (conc. opn. of Sotomayor, J.) [the prosecution’s introduction only of “machine-generated results, such as a printout from a gas chromatograph,” may not violate the defendant’s confrontation right].) Because, unlike a person, a machine cannot be cross-examined, here the prosecution’s introduction into evidence of the machine-generated printouts shown in pages 2 through 6 of nontestifying analyst Peña’s laboratory report did not implicate the Sixth Amendment’s right to confrontation.
A more difficult question is posed by the report’s first page, which is a chart containing certain information written by the testing analyst. Filled in by hand is information pertaining to “Booking #,” “Lab Number,” “Sample Sealed,” “Subject’s Name,” and “Arresting Officer,” for nine blood samples drawn from nine different individuals and tested on the same day by the same analyst. As to all nine individuals, analyst Willey testified, this information was filled in by laboratory assistant Brian Constantino, whose initials appear at the top of the page under the heading “Logged By.” Included in the information written by Constantino are defendant’s name, the laboratory number (No. 070-7737) given to defendant’s blood sample, the date and time the sample was collected, and the date and time the sample was received at the laboratory. Peña’s initials appear in the box bearing the heading' “Analyzed] By.” The chart further shows the date the blood was analyzed and the *584 results of the blood analysis (0.09), indicating that defendant’s blood sample had a blood-alcohol concentration of 0.09 percent. This information appears to have been entered by analyst Peña.
Of significance here is the indication on page 1 of nontestifying analyst Peña’s laboratory report that defendant’s blood sample was labeled with laboratory No. 070-7737, which was entered by laboratory assistant Constantino. Based on that labeling and the machine-generated results for blood sample No. 070-7737, prosecution expert witness Willey gave his independent opinion—reflecting his “separate abilities as a criminal analyst”—that defendant’s blood sample contained 0.09 percent alcohol. It is undisputed that Constantino’s notation linking defendant’s name to blood sample No. 070-7737 was admitted for its truth. (Compare Williams, supra, 567 U.S. at p._[132 S.Ct. 2221], in which the plurality opinion, Justice Thomas’s concurring opinion, and the dissenting opinion disagreed on whether the pertinent evidence was admitted for its truth.) Thus, the critical question here is whether that notation is testimonial hearsay and hence could not be used by the prosecution at trial.
The notation in question does not meet the high court’s requirement that to be testimonial the out-of-court statement must have been made with formality or solemnity. (See Davis v. Washington, supra, 547 U.S. at p. 830, fn. 5 [“formality is indeed essential to testimonial utterance”]; Melendez-Diaz, supra, 557 U.S. at p. 310 [stressing that each of the laboratory certificates determined to be testimonial was “a ‘ “solemn declaration or affirmation” ’ ”]; Bullcoming, supra, 564 U.S. at p._[131 S.Ct. at p. 2717] [the laboratory certificate found to be testimonial was “ ‘formalized’ in a signed document” that referred to “rules” that made the document admissible in court].) Although here laboratory analyst Peña’s initials appear on the same line that shows defendant’s name and laboratory assistant Constantino’s initials appear at the top of the page to indicate that he entered the notation that defendant’s blood sample was given laboratory No. 070-7737, neither Constantino nor Peña signed, certified, or swore to the truth of the contents of page 1 of the report. The chart shows only numbers, abbreviations, and one-word entries under specified headings. Thus, the notation on the chart linking defendant’s name to blood sample No. 070-7737 is nothing more than an informal record of data for internal purposes, as is indicated by the small printed statement near the top of the chart: “for lab use only.” Such a notation, in our view, is not prepared with the formality required by the high court for testimonial statements.
Defendant. argues that nontestifying analyst Peña’s laboratory report is indistinguishable from the laboratory certificates that the high court determined to be testimonial in Melendez-Diaz and Bullcoming. Not so. In *585 Melendez-Diaz, “the certificates were sworn to before a notary . . .” by the testing analysts who had prepared the certificates. (Melendez-Diaz, supra, 557 U.S. at p. 308.) And in Bullcoming, the laboratory analyst’s certificate regarding the result of his analysis was “ ‘formalized’ in a signed document” that expressly referred to court rules providing for the admissibility of such certificates in court. (Bullcoming, supra, 564 U.S. at p. _ [131 S.Ct. at p. 2717].) Such formality is lacking here.
Defendant contends that Peña’s laboratory report is testimonial under the reasoning of the dissenting opinion in Williams, supra, 567 U.S. _ [132 S.Ct. 2221] (dis. opn. of Kagan, J.). This may well be true, but dissenting opinions are not binding precedent. (U.S. v. Ameline (9th Cir. 2005) 409 F.3d 1073, 1083, fix. 5; Purcell v. BankAtlantic Financial Corp. (11th Cir. 1996) 85 F.3d 1508, 1513.)
Because of our conclusion that the notation in nontestifying analyst Peña’s laboratory report linking defendant’s name to blood sample No. 070-7737 was not testimonial in nature, the trial court here was correct in overruling defendant’s objection to that portion of the report, in permitting the prosecution to introduce that portion of the report into evidence, and in permitting expert Willey to testify regarding it. In holding to the contrary, the Court of Appeal erred. To the extent that any other notations on the first page of the chart could be considered testimonial, their admission was harmless “ ‘beyond a reasonable doubt’ ” (Geier, supra, 41 Cal.4th at p. 608 [beyond a reasonable doubt standard of error applies to violations of 6th Amend, confrontation right]), in light of prosecution witness Willey’s independent opinion (see p. 574, ante) that defendant’s blood sample contained a blood-alcohol concentration of 0.09 percent.
Disposition
We reverse the judgment of the Court of Appeal.
Cantil-Sakauye, C. J., Baxter, J., Werdegar, J., and Chin J., concurred.

 Vehicular manslaughter while intoxicated (Pen. Code, § 191.5, subd. (b)), the crime with which defendant was charged, occurs when a defendant commits an act of vehicular manslaughter while “driving ... in violation of Section 23140, 23152, or 23153 of the Vehicle Code . . . .” (Ibid.) Under these Vehicle Code provisions, the prosecution may prove intoxication by showing that the defendant’s blood-alcohol level was 0.08 percent or greater at the time of the accident (see Veh. Code, § 23152, subd. (b); id., § 23153, subd. (b)); or, if the defendant’s blood-alcohol level was lower than 0.08 percent, by showing that the alcohol made the defendant unable to “drive . . . with the caution of a sober person, using ordinary care, under similar circumstances.” (CALCRIM No. 2110; see Veh. Code, §§ 23152, subd. (a), 23153, subd. (a); People v. Schoonover (1970) 5 Cal.App.3d 101, 105-107 [85 Cal.Rptr. 69].)