Filed 2/25/13  P. v. Gary CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>BUDDY RAY GARY,<br><br>    Defendant and Appellant. | F063769<br><br>(Super. Ct. No. 1256526)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Stanislaus County.  John D. Freeland, Judge.

Matthew H. Wilson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Charles A. French and John G. McLean, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Following a 2011 jury trial, appellant Buddy Ray Gary was convicted of a first degree felony murder that occurred in 1976. (Pen. Code, § 187, subd. (a).)[1] The trial court sentenced Gary to a prison term of seven years to life, the allowed sentence in 1976. The sentence was ordered to run consecutively to a 25-year-to-life prison term that Gary was already serving.

On appeal, we reject Gary's contention that he was denied his right to confront adverse witnesses in violation of the Sixth Amendment to the United States Constitution. We agree with his contention that the imposition of fines under sections 1202.4 and 1202.45 violates the prohibition against ex post facto laws and the matter must be reversed and remanded for a restitution hearing as described in this opinion. In all other respects, we affirm.

### FACTS AND TRIAL COURT PROCEEDINGS

On the morning of August 30, 1976, Florence Millard, a widow in her 80's, was found semiconscious and crying in the hallway of her home, her hands tied and her face beaten beyond recognition. She had a nightgown and bloody bra around her neck. There was blood spattered on the walls in the hallway and on the floor in the bedroom. The metal lattice was torn away from the front screen door; a hole was punched in the screen on the back door and a tool had been used to unlock it. Millard died at the hospital on September 11, 1976.

Homicide Detective Elvin Thomason, who worked on the case in 1976 and has now retired, testified that he responded to the scene of the assault and then went to the hospital where Millard was taken. He described Millard's face as badly beaten and swollen, with two black eyes. She had a two-inch cut on the right side of her chin. He was not able to observe any other parts of her body. Thomason visited Millard at the hospital on several subsequent occasions before she died, each time she was unconscious.

---

[1] Further statutory references are to the Penal Code unless otherwise stated.

During the course of his subsequent investigation, Detective Thomason obtained a diamond ring from a local pawn shop. The officer suspected the ring came from Millard's house, and Gary became a suspect based on some unnamed association with the ring. But Gary was just one of four or five suspects at the time, and the case remained unsolved.

In 2007, Detective Craig Grogan, assigned to cold cases, learned about a box of evidence from this case. Grogan sent a number of those items in for DNA testing, including a throw rug Millard was found lying on and recovered from the scene. At some point, Grogan met with Gary and took a buccal swab from him. DNA from a semen stain on the rug was a match to the DNA sample obtained from Gary. The odds that the sample was not Gary's DNA were one in 410 quintillion.

Dr. Ernoehazy, the coroner who performed the autopsy on Millard, was not alive at the time of trial. But a forensic pathologist, Dr. Sung-Ook Baik, testified that he reviewed the photographs of the victim in life and at the scene of the attack, the transcript of the preliminary hearing, the statements of Millard's neighbor, an investigative report prepared on the day of the attack, the victim's death certificate which stated that Millard died of bronchopneumonia and atelectasis of the lung, the 1976 observations and notations of the coroner who performed the autopsy, and statements made by a Dr. William Ricketts. The original coroner's diagnosis and conclusions were excluded from the report reviewed by Dr. Baik.

Dr. Baik's review of the above mentioned documents revealed that when Millard was found, she was semicomatose and had suffered a cerebral concussion. At the time of her death, she had bruises on both sides of her face, her left eye, her temples, the right side of her neck, the front and back of her head, her left shoulder and her upper extremities. She had a fracture on the left facial bone, three fractured ribs on the left side, five fractured ribs on the right side, and a fractured sternum. There were hemorrhages on

3.

the front, back and both sides of her head. She had bronchopneumonia and a collapsed left lung.

Dr. Baik noted from the autopsy report that the victim had had severe arteriosclerotic coronary artery disease and had previously undergone surgery for an abdominal aortic aneurysm related to her cardiovascular disease. The autopsy made clear that there was no damage to the surgical repair. According to Dr. Baik, cardiovascular disease was not unusual for someone 81 years of age.

Based on his review, Dr. Baik opined that Millard died of blunt-force injury to the head, face, chest, and upper extremities, which was complicated by bronchopneumonia. Dr. Baik opined that arteriosclerotic cardiovascular disease was a significant finding, but was not a contributing factor in Millard's death. According to Dr. Baik, it was not unusual for a hospitalized elderly person to develop pneumonia because they have a reduced immune system, which is further reduced by trauma, making them more susceptible to infection.

The defense presented no witnesses, but Gary's defense was that there was insufficient evidence to prove that he caused Millard's death, due to her advanced age, underlying health problems, and the discrepancies or uncertainties in the medical reports. Defense counsel urged the jury to discount Dr. Baik's testimony since he had to rely on documents prepared by others many years earlier.

## DISCUSSION

I.    RIGHT TO CONFRONT WITNESSES

Gary contends that he was prejudicially denied his Sixth Amendment right to confront witnesses against him when the trial court allowed Dr. Baik, who did not perform the autopsy on Millard, to use the observations and notations from the autopsy report to testify about the cause of her death. He also contends that Dr. Baik improperly relied on a police report, which included a statement by Dr. Ricketts concerning the extent of Millard's injuries. In support of his position, Gary relies on several decisions of

4.

the United States Supreme Court, commencing with *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*). We will discuss *Crawford,* and its progeny, and determine that Dr. Baik's testimony did not abridge Gary's confrontation rights.

### *Procedural Background*

Gary was charged with the first degree murder of Millard. Before trial, the prosecution asked that pathologist Dr. Baik be allowed to testify because the original pathologist, who conducted the autopsy 35 years earlier, had died. The prosecution argued that Dr. Baik would not have access to the original pathologist's autopsy report, but would instead have reviewed the preliminary hearing transcript, all exhibits admitted at the preliminary hearing, the death certificate, various photographs, and police reports. The prosecution stated that, from that material, Dr. Baik would testify that the cause of death was pneumonia, which was "secondary" to the injuries sustained in the original assault. Defense counsel objected to the evidence based on the then recent case of *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305 (*Melendez-Diaz*). Defense counsel argued that, if Dr. Baik looked at "slides, specimens [and] things of that nature, that one's thing. But if he's relying on, again, somebody else's verbiage, I don't believe that's sufficient." Later, defense counsel again voiced objection to Dr. Baik's testimony derived from reports prepared by others and that were not based on his own direct observation of "slides, photos [and] medical records."

Following an Evidence Code section 402 hearing, in which Dr. Baik testified that he had in fact read the autopsy report but not the original pathologist's findings or conclusions, the trial court admitted the testimony. At trial, Dr. Baik testified that he had reviewed the evidence and testimony from the preliminary hearing, including the statements of Dr. Ricketts, along with the autopsy report, but minus the original pathologist's findings and conclusions. With that information, Dr. Baik opined that the cause of Millard's death was due to multiple blunt force injury, complicated by pneumonia and arteriosclerosis.

### Applicable Law and Analysis

In *Crawford, supra,* 541 U.S. at page 38, the Supreme Court considered the admissibility at trial of a tape-recorded statement made by the defendant's wife to police. Because the witness did not testify at trial due to a state marital privilege statute, the defendant argued that admission of his wife's out-of-court statement violated his federal constitutional right under the Sixth Amendment to confront witnesses offering testimony against him. (*Id.* at p. 40.) The Supreme Court agreed, stating that "[t]estimonial statements of witnesses absent from trial [may be] admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." (*Id.* at p. 59, fn. omitted.)

The two-prong *Crawford* test of witness unavailability and prior opportunity to cross-examine applies only to statements that are "testimonial," not nontestimonial hearsay. (*Crawford, supra,* 541 U.S. at p. 68.) Although the *Crawford* court declined to "spell out a comprehensive definition of 'testimonial,'" it explained that "[w]hatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations. These are the modern practices with closest kinship to the abuses at which the Confrontation Clause was directed." (*Ibid.*)

In *Davis v. Washington* (2006) 547 U.S. 813, 817 (*Davis*), the Supreme Court considered whether statements made to law enforcement personnel during a 911 call or at a crime scene are "testimonial" and thus subject to the requirements of the Sixth Amendment's Confrontation Clause. The court concluded that "[s]tatements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency," but "[t]hey are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the

6.

primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." (*Id.* at p. 822, fn. omitted.)

In *Melendez-Diaz, supra,* 557 U.S. 305, the United States Supreme Court addressed whether notarized certificates by lab analysts describing the existence and quantity of contraband (cocaine) in bags found in the defendant's possession were "testimonial," making their admission into evidence violative of the Confrontation Clause. The certificates were prepared nearly a week after the tests of the contraband were performed. (*Id.* at p. 315.) The court concluded that the certificates, which constituted affidavits, fell within the "'core class of testimonial statements'" proscribed by *Crawford* (*Melendez-Diaz, supra,* at p. 310), and that they were "functionally identical to live, in-court testimony, doing 'precisely what a witness does on direct examination.' [Citation.]" (*Id.* at pp. 310-311.) The court therefore held that "[a]bsent a showing that the analysts were unavailable to testify at trial *and* that [the defendant] had a prior opportunity to cross-examine them, [the defendant] was entitled to '"be confronted with"' the analysts at trial. [Citation.]" (*Id.* at p. 311, quoting *Crawford, supra,* 541 U.S. at p. 54, fn. omitted.)

In *Bullcoming v. New Mexico* (2011) 564 U.S.___[131 S.Ct. 2705] (*Bullcoming*), the Supreme Court considered the admission of a laboratory report of a forensic analyst who tested the defendant's blood sample and certified that the blood alcohol concentration (BAC) in the sample was 0.21 grams per hundred milliliters, "an inordinately high level," which supported the defendant's conviction of aggravated drunk driving. (*Id.* at pp. 2710-2711.) The Supreme Court held that the admission of the report violated the Confrontation Clause because "[t]he accused's right is to be confronted with the analyst who made the certification, unless that analyst is unavailable at trial, and the accused had an opportunity, pretrial, to cross-examine that particular scientist." (*Id.* at p. 2710.) In so holding, the court rejected the New Mexico Supreme Court's conclusion that the live testimony of another analyst satisfied the constitutional requirement of

confrontation, noting that the testifying analyst, who had neither participated in nor observed the blood test "could not convey what [the certifying tester] knew or observed about the events his certification concerned, i.e., the particular test and testing process employed." (*Id.* at p. 2715, fn. omitted.) Neither could the testifying analyst "expose any lapses or lies on the certifying analyst's part." (*Ibid.*, fn. omitted.)

In the recent case of *Williams v. Illinois* (2012) 567 U.S. ___ [132 S.Ct. 2221] (*Williams*)[2], the Supreme Court considered a forensic DNA expert's testimony that included her reliance on a DNA profile from a rape victim produced by an outside laboratory in the expert's matching of that profile to a DNA profile the state laboratory produced from the defendant's blood sample. (*Id.* at pp. 2222-2223.) Justice Alito writing with the concurrence of three justices and with Justice Thomas concurring in the judgment, concluded that the expert's testimony did not violate the defendant's confrontation rights. The plurality held that the outside laboratory report, which was not admitted into evidence (*id.* at pp. 2230, 2235), was "basis evidence" to explain the expert's opinion, was not offered for its truth, and therefore did not violate the Confrontation Clause. (*Id.* at pp. 2239-2240.) The Supreme Court concluded further that, even had the report been offered for its truth, its admission would not have violated the Confrontation Clause, because the report was not a formalized statement made primarily to accuse a targeted individual. (*Id.* at pp. 2242-2244.) Applying an objective test in which the court looks "for the primary purpose that a reasonable person would have ascribed to the statement, taking into account all of the surrounding circumstances" (*id.* at p. 2243), the Court found that the primary purpose of the outside lab report "was to catch a dangerous rapist who was still at large, not to obtain evidence for use against [the defendant], who was neither in custody nor under suspicion at that time." (*Ibid.*)

---

**2**    On July 2, 2012, this Court asked the parties for supplemental briefing addressing *Williams*, which was decided June 18, 2012, after briefing in this case was completed.

Further, the Court found that no one at the outside laboratory could have possibly known that the profile it generated would result in inculpating the defendant, and there was therefore no prospect for fabrication and no incentive for developing something other than a scientifically sound profile. (*Id.* at pp. 2243-2244.)

Two even more recent California Supreme Court cases merit discussion.[3] In *Lopez, supra,* 55 Cal.4th 569, the defendant challenged on Confrontation Clause grounds the introduction of a nontestifying laboratory analyst's report indicating the percentage of alcohol present in the defendant's blood sample drawn two hours after a fatal traffic accident; in admitting the evidence, the prosecution utilized the testimony of a colleague of the analyst who had prepared the report. (*Id.* at p. 573.) Our high court in *Lopez* distilled *Crawford, supra,* 541 U.S. 36 and its progeny as requiring the presence of "two critical components" in order for a statement to be "'testimonial'" for purposes of the Confrontation Clause. (*Lopez, supra,* at p. 581.) Those components are that (1) "the out-of-court statement must have been made with some degree of formality or solemnity" (*id.* at p. 581), and (2) the statement's "primary purpose pertains in some fashion to a criminal prosecution" (*id.* at p. 582). Because it concluded that the lab analyst's report did not have the required formality or solemnity, the court concluded that it was not testimonial. (*Id.* at p 582.)

In *Dungo, supra,* 55 Cal.4th 608, which is most akin to the situation here, our Supreme Court addressed whether the defendant's confrontation rights were violated where a forensic pathologist testified concerning the cause of death of the victim (strangulation), utilizing facts taken from an autopsy report prepared by a nontestifying pathologist and photographs of the victim. (*Id.* at p. 614.) The court rejected the

---

[3] On January 18, 2013, this Court asked the parties for supplemental briefing addressing *People v. Lopez* (2012) 55 Cal.4th 569 (*Lopez*) and *People v. Dungo* (2012) 55 Cal.4th 608 (*Dungo*), both decided October 15, 2012, after briefing in this case was completed.

defendant's claim, holding that neither of the two requisite components of a testimonial statement were present. The court concluded that the statements contained in the autopsy report – which was not introduced into evidence – were (1) "less formal than statements setting forth a pathologist's expert conclusions" and were akin to a physician's nontestimonial "observations of objective fact" in diagnosing a patient's injury or malady and indicating the appropriate treatment for it (*id.* at p. 619); and (2) "criminal investigation was not the *primary* purpose for the autopsy report's description of the condition of [the victim's] body; it was only one of several purposes." (*Id.* at p. 621). "The autopsy report itself was simply an official explanation of an unusual death, and such official records are ordinarily not testimonial." (*Id.* at p. 621, citing *Melendez-Diaz, supra,* 557 U.S. at p. 324.)

Here, the facts from the autopsy report that Dr. Baik related to the jury were not so formal and solemn as to be considered for testimonial purposes of the Sixth Amendment's confrontation right, and criminal investigation was not the primary purpose for recording the facts in question, it was only one of several purposes. (*Dungo, supra,* 55 Cal.4th at p. 621.) Thus, drawing upon our high court's recent *Dungo* decision, Dr. Baik's description to the jury of objective facts about the condition of victim Millard's body, facts he derived, in part, from the coroner's autopsy report[4] and its accompanying photographs, as well as the evidence and testimony from the preliminary hearing, did not give Gary a right to confront and cross-examine the original coroner himself. Thus, Gary's Sixth Amendment right was not violated by Dr. Baik's testimony.

As for Dr. Baik's reliance on Dr. Rickett's statements regarding Millard's broken ribs, we note first that Detective Thomason, who made the report which contained those

---

[4] Unlike *Dungo,* in which the autopsy report was not introduced into evidence, the autopsy report here was introduced into evidence by the defense in order to highlight what it argued were inconsistencies between it and the certificate of death.

10.

statements, testified at trial and was cross-examined by the defense. But to the extent that the statements by Dr. Ricketts, which consisted only of the statement that Millard's finjuries to her ribs consisted of three rib fractures on the left side and five rib fractures on the right side, were improperly relied upon by Dr. Baik, its admission was harmless "'"beyond a reasonable doubt."' [Citation.]" (*Lopez, supra,* 55 Cal.4th at p. 571.)

The jury was instructed, pursuant to CALCRIM No. 620, in pertinent part as follows:

> "There may be more than one cause of death. An act causes death only if it is a substantial factor in causing the death. A *substantial factor* is more than a trivial or remote factor. However, it does not need to be the only factor that causes the death."

Aside from Dr. Baik's testimony, the evidence at trial was that Millard was self-sufficient and in excellent health prior to the attack; when she was found, she was tied up, crying and beaten beyond recognition; when officers arrived, she was semiconscious with blood spattered on the walls; the detective who visited Millard in the hospital over the course of several days spoke to her briefly the first day, but she was unconscious on each of the other occasions; and Millard died 11 days after the attack. In addition, aside from the reports of Drs. Ernoehazy and Ricketts, Dr. Baik also relied on photographs of Millard prior to and after the attack, the transcript of the preliminary hearing (aside from Dr. Ricketts statements), and the statements of Millard's neighbor in arriving at his opinion on the cause of Millard's death.

Any error in the admission of Dr. Baik's testimony regarding the reports of Drs. Ernoehazy and Ricketts was harmless beyond a reasonable doubt.

## II.    IMPOSITION OF FINES

At sentencing, the trial court imposed a $10,000 fine pursuant to section 1202.4 and a suspended parole revocation fine in the same amount under section 1202.45. Gary contends, and the People agree, that the $10,000 parole revocation fine imposed pursuant to section 1202.45 must be stricken, and the $10,000 restitution fine imposed pursuant to

section 1202.4 must be vacated and the matter remanded to the trial court for a hearing on Gary's ability to pay restitution. We agree as well.

Gary committed the offense in this case before the January 1, 1984, operative date of amended Penal Code section 1202.4 and the August 3, 1995, operative date of Penal Code section 1202.45. Thus, these fines cannot be imposed without violating the constitutional prohibition against ex post facto laws. (See, e.g., *People v. Callejas* (2000) 85 Cal.App.4th 667, 676, 678 [§ 1202.45]; *People v. Downing* (1985) 174 Cal.App.3d 667, 672 [§ 1202.4].)

But, as Gary acknowledges, the version of Government Code section 13967[5] in effect at the time of Gary's crime provided that a restitution fine of at least $10 but not to exceed $10,000 should be imposed after the trial court inquired into the defendant's present ability to pay and the economic impact of the fine on the person's dependents. (Stats. 1973, ch. 1144, § 2, p. 2351; see also *People v. McCaskey* (1985) 170 Cal.App.3d 411, 414.) Thus, this matter should be remanded for a hearing which complies with the version of Government Code section 13967 in effect at the time of the murder in this case, and to determine Gary's ability to pay and the effect of any fine on Gary's dependents, if there are any.

There was no version of section 1202.45 in effect at the time of the murder in this case. The parole revocation fine imposed pursuant to that section must be stricken.

---

**5** At the time, Government Code section 13967 provided: "Upon a person being convicted of a crime of violence committed in the State of California resulting in the injury of death of another person, if the court finds that the defendant has the present ability to pay a fine and finds that the economic impact of the fine upon the defendant's dependents will not cause such dependents to be dependent on public welfare the court shall, in addition to any other penalty, order the defendant to pay a fine commensurate with the offense committed, and with the probable economic impact upon the victim, but not to exceed ten thousand dollars ($10,000)…."

## **DISPOSITION**

The parole revocation fine imposed pursuant to section 1202.45 is stricken. The restitution fine imposed pursuant to section 1202.4 is vacated and this matter is remanded for a restitution hearing as described in this opinion. In all other respects, the judgment is affirmed.

_____
Franson, J.

WE CONCUR:

_____
Kane, Acting P.J.

_____
Poochigian, J.

13.