Filed 4/26/13  P. v. Quiroz CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>IVAN QUIROZ,<br><br>    Defendant and Appellant. | B241039<br><br>(Los Angeles County<br>Super. Ct. No. NA089299) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Laura Laesecke, Judge.  Affirmed.

Craig C. Kling, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Susan Sullivan Pithey and Louis W. Karlin, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

A jury convicted defendant Ivan Quiroz of burglary (Pen. Code, § 459), finding the burglary was in the first degree because defendant entered an inhabited dwelling with the intent to commit larceny.[1] Quiroz was sentenced to the upper term of six years in state prison.

Defendant contends on appeal that the trial court erred by admitting testimony by a fingerprint expert that her analysis had been verified by two other forensic analysts in her laboratory, in violation of his Sixth Amendment right to confront adverse witnesses. Because we conclude any error in admitting the testimony was harmless beyond a reasonable doubt, we affirm the judgment.

## FACTUAL BACKGROUND

Claudia Sanchez and her four children came to Southern California for vacation, arriving in Long Beach the morning of November 4, 2010. She checked into the Hotel Current, room 127, a corner, ground floor room with two beds and a bathroom. She was given two keycards, which she kept in her possession. The bathroom window faced the parking lot behind the hotel where her car was parked. The family put their luggage in the room, had breakfast, and at around 10:00 a.m. they prepared to leave for Disneyland. Sanchez made sure the bathroom window was shut, the lights and air conditioning were turned off, and the front window and door were closed and locked. As she drove away, she saw that the bathroom window and screen were undamaged.

The Sanchez family returned to their hotel room around 1:00 a.m. the following morning. As soon as she parked near the hotel room, she saw that the lights were turned on in the room, the bathroom window screen was bent open, and the bathroom window was open. The door to the room was propped open with the hinge used to lock the door from the inside. Sanchez looked inside the room and saw that the television set and

---

[1]     All further undesignated statutory references are to the Penal Code.

2

refrigerator were gone.  The family's jackets, six packed suitcases, portable DVD player, a DVD movie, and $300 in cash were also gone.  She notified the front desk and the police were called.  She had not given anyone permission to enter the hotel room.

The hotel's general manager said room 127 had recently been renovated, including replacement of the bathroom window screen.  The manager met Sanchez in the hotel lobby around 1:20 a.m. and accompanied her and a police officer to room 127.  The room had been ransacked; the alarm clock with an iPod dock was gone, along with the television and refrigerator.  The hotel's electronic reporting system indicated a housekeeper had entered the room the morning of November 4th using her magnetic keycard, and no one else had used a magnetic keycard to enter the room for the rest of the day.  At trial, the manager did not recognize defendant.  Defendant was not employed by the hotel and he was not on the renovation contractor's payroll.

Long Beach Police Officer Vincent Kong responded to the burglary scene.  He saw that the bathroom window screen to room 127 had been pried open.  Based on Sanchez's assurance that she locked the doors and windows before leaving the room and due to the lack of damage to the front window and door, Officer Kong concluded the burglar had entered the room through the rear bathroom window.

Heather Cochran, a forensic specialist for the City of Long Beach with 16 years of experience with fingerprint evidence, examined for fingerprints on various surfaces inside room 127, as well as the bathroom window and screen.  She obtained only one fingerprint, from the bathroom window screen.  Cochran transferred the latent fingerprint onto an exemplar card, and the card was admitted into evidence at trial.

Nancy Preston was declared an expert in fingerprint examination at trial.  Preston is a forensic specialist with the Long Beach Police Department's crime laboratory and has 19 years of experience in the field, including specialized training.  Preston received the fingerprint exemplar card prepared by Cochran on November 11, 2010 (People's exhibit 9).  Preston ran the print through the Automated Fingerprint Identification System (AFIS) database to search for potential matches.  The AFIS generated a list of 50 possible candidates for comparison, using a mathematical program to rank the results in order of

3

the probability of each being a match.  Preston examined the AFIS list by comparing the computer-generated fingerprints to the print on the exemplar card.  The fourth one on the AFIS list appeared to her to be a potential match.  She therefore generated an exemplar card of that print.  Preston visually compared the latent print exemplar card to the AFIS exemplar card, using a magnifying glass and fingerprint pointers, and determined they matched.  The AFIS card was a print of defendant's right middle finger (People's exhibit 10).

On December 19, 2011, Preston met with defendant and rolled his fingerprints in order to create a third exemplar card (People's exhibit 11).  When she compared the AFIS exemplar to the one she obtained from defendant she determined they matched.  She concluded that all three prints were made by the same person, defendant.

The prosecutor inquired if Preston's work was verified or checked by anyone else in her lab, and she replied in the affirmative.  The prosecutor asked how many people had checked it and defense counsel objected, saying out of the jury's presence, "If counsel intends to elicit testimony from this witness as to the examinations of other people, I'm going to object as calls for hearsay.  I don't see how she can just say to this witness did someone else check your work and was it deemed accurate without putting on that witness and subjecting that witness to cross-examination."

The prosecutor argued Preston's testimony fell under the business records exception to the hearsay rule.  Defense counsel responded that the business records exception does not include matters that require analysis and results of tests without making the other people available for cross-examination to explore what analysis or techniques they used, what the results of their comparisons were, and what features they looked at.  The trial court indicated that it was a combination of the business records exception and the principle that an expert can rely on hearsay as part of his or her opinion; the fact her analysis was verified by other individuals formed part of her opinion. Defense counsel replied that the other people did the exact same thing this witness had done, and by allowing her to testify about what the others did his client was denied the opportunity to cross-examine the other expert witnesses.

4

The trial court ascertained that there was a notation on the exemplar card that the print was verified, and ruled that was part of the business record. The court stated that it saw no distinction between this situation and one in which an expert rendered an opinion based on his or her own observations or calculations as well as consultation with colleagues or other experts. The court overruled the objection.

Preston then testified that two other people verified her work, as was standard procedure in her laboratory as well as in many other laboratories. This was done as a quality control measure to ensure no errors were made before a report was sent to the detectives. Also, "as in any science it shows that the results can be duplicated and it is an accepted method to validate your initial findings." Preston identified the other two reviewers as Pete Pkergil and Cynthia Watts. Preston's "latent print CSI analysis report" was marked as People's exhibit 12. It contained a notation of "verified by," followed by two signatures. Preston stated that in verifying her work Pkergil and Watts were agreeing with her conclusion. If she had made an erroneous identification her peers would have alerted her to that fact, as was standard practice in her industry.

On cross-examination, Preston stated that her two colleagues did not compare all of the AFIS candidates prior to comparing the prints in Preston's report. Preston did not make any notes of why she rejected as matches the first three candidates on the AFIS-generated list. Once she determined the fourth print was a match, she did not compare other prints from the AFIS list. She agreed that the fingerprint obtained from the crime scene was incomplete. It was less than half of a complete print because the center portion was absent, the right portion was smeared, and the left portion was too dark to see any characteristics. Preston specified that she did not do a direct visual comparison between the card of defendant's prints that she rolled herself and the original latent print taken from the crime scene; rather she compared the print she rolled with the AFIS exemplar card that she previously determined matched the latent print. Defense counsel asked if there was an error rate involved with fingerprint identification, and Preston responded that there was not an established error rate that she could cite but the amount of errors that had been discovered indicated the error rate was "very, very, very low." She agreed

that the only way errors could be discovered in her lab was by the verification process they used. She acknowledged that the colleagues who checked her work knew when performing their analysis that she had reached the conclusion the three exemplar cards matched. She knew from performing verifications herself that they would have done their own independent comparisons.

On June 6, 2011, defendant was questioned about the November 4, 2010 robbery at the Hotel Current by Police Officer Robert Bernsen. Defendant waived his *Miranda*[2] rights. Officer Bernsen took defendant to the hotel and showed him where the burglar had entered the hotel room. Defendant said he had never been to the hotel before.

Defendant did not present any evidence in his defense.

This timely appeal followed.

## DISCUSSION

Defendant contends Preston's testimony that her fingerprint analysis was verified and duplicated by two other analysts, Pkergil and Watts, was testimonial hearsay and violated his Sixth Amendment right to cross-examine witnesses under *Crawford v. Washington* (2004) 541 U.S. 36 and its progeny. We conclude that any error was harmless.[3]

United States Supreme Court decisions regarding under what conditions introduction of forensic analyses such as lab reports violates the Sixth Amendment (*Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305, *Bullcoming v. New Mexico* (2011) 564 U.S. ___ [180 L.Ed.2d 610, 131 S.Ct. 2705], and *Williams v. Illinois* (2012) 567 U.S. ___ [183 L.Ed.2d 89, 132 S.Ct. 2221]) have created a "muddled state of current

---

[2]     *Miranda v. Arizona* (1966) 384 U.S. 436.

[3]     Respondent contends that defendant has forfeited the issue. We disagree. "[W]here, as here, the context makes clear that the court and opposing counsel were aware that the confrontation clause was the basis of the hearsay objection, the constitutional objection is preserved." (*People v. Holmes* (2012) 212 Cal.App.4th 431, 436.)

6

doctrine" that is difficult to decipher and which we do not attempt to summarize.  (*People v. Lopez* (2012) 55 Cal.4th 569, 575 (Liu, J., dis.) (*Lopez*).)  Recently, the California Supreme Court undertook the task in *Lopez*, *supra*, and *People v. Dungo* (2012) 55 Cal.4th 608.

The court held in *Lopez:*  "Under this quartet of cases [*Crawford*, *Melendez-Diaz*, *Bullcoming*, *and Williams*] . . . , the prosecution's use at trial of testimonial out-of-court statements ordinarily violates the defendant's right to confront the maker of the statements unless the declarant is unavailable to testify and the defendant had a prior opportunity for cross-examination.  Although the high court has not agreed on a definition of 'testimonial,' a review of the just-mentioned four decisions indicates that a statement is testimonial when two critical components are present.  [¶]  First, to be testimonial the out-of-court statement must have been made with some degree of formality or solemnity.  [Citations.]  The degree of formality required, however, remains a subject of dispute in the United States Supreme Court.  [Citations.]  [¶]  Second, all nine high court justices agree that an out-of-court statement is testimonial only if its primary purpose pertains in some fashion to a criminal prosecution, but they do not agree on what the statement's primary purpose must be.  For instance, in this year's *Williams* decision, Justice Alito's plurality opinion said that the Cellmark laboratory's report at issue was not testimonial because it had not been prepared 'for the primary purpose of *accusing a targeted individual.*'  (*Williams*, *supra*, 567 U.S. at p. ___ [132 S.Ct. at p. 2243] (plur. opn. of Alito, J.), italics added.)  Justice Thomas's concurring opinion criticized that standard, describing it as lacking 'any grounding in constitutional text, in history, or in logic.'  (*Id.* at p. ___ [132 S.Ct. at p. 2262] (conc. opn. of Thomas, J.).)  Instead, for Justice Thomas, the pertinent inquiry is whether the statement was 'primarily intend[ed] to establish some fact with the understanding that [the] statement may be used in a criminal prosecution.'  (*Id.* at p. ___ [132 S.Ct. at p. 2261] (conc. opn. of Thomas, J.).)  And under the *Williams* dissent, the pertinent inquiry is whether the report was prepared 'for the primary purpose of establishing "past events potentially relevant to later criminal prosecution"—in other words, for the purpose of providing evidence.'  (*Id.* at

7

p. ___ [132 S.Ct. at p. 2273] (dis. opn. of Kagan, J.), joined by Justices Scalia, Ginsburg, and Sotomayor.)" (*Lopez*, *supra*, 55 Cal.4th at pp. 581-582; see also *Dungo*, *supra*, 55 Cal.4th at p. 619.)

In *People v. Rutterschmidt* (2012) 55 Cal.4th 650, 661, decided the same day as *Lopez* and *Dungo*, the court declined to decide whether, under the *Lopez* formulation, the trial court erred in admitting the testimony of a laboratory director who relied on reports he did not prepare to testify that testing of the murder victim's blood samples at his laboratory determined the presence of drugs that could have caused drowsiness. (*Id.* at p. 652.) The court instead determined that any error was harmless beyond a reasonable doubt. (*Id.* at p. 661.)

Like the court in *Rutterschmidt*, we decline to decide whether Preston's testimony that her fingerprint analysis was verified and duplicated by Pkergil and Watts violated the Sixth Amendment, because any error was harmless beyond a reasonable doubt. It is true that the only evidence connecting defendant to the burglary was Preston's opinion that defendant's latent print matched one at the crime scene. However, Preston personally and independently performed her own fingerprint comparison, testified to that comparison, and was available for cross-examination. When asked whether her conclusion was "verified or checked by anyone else in [her] lab," she testified without objection that it was; it was only when the prosecutor asked how many people had checked it that defense counsel objected. From that testimony alone the jury knew that someone had verified her results. As for the hearsay objection, it is clear that under California law an expert can rely on out-of-court statements to form their opinion, and that is what the expert did here—the verifications were part of the evidence she considered in giving her expert opinion. Preston's testimony was also a relevant, accurate description of the process used in her laboratory. Her report, which was admitted into evidence, was signed by the two other experts as "verification signatures."

Defendant was free to cross-examine Preston about all of the topics that he suggests on appeal might have cast doubt on *her* opinion—why she did not take notes regarding why the first three AFIS prints did not match the one at the crime scene, why

she did not examine any of the other AFIS prints after defendant's, the nature of the crime scene print as only partial, and other like topics. Moreover, there is nothing to suggest that cross-examination of the two people who verified Preston's results would have been helpful in evaluating Preston's opinion. Further, defendant presented no evidence whatsoever, and in particular no expert testimony challenging Preston's comparison. Under these circumstances, any error in admitting Preston's testimony that Pkergil and Watts verified and duplicated her work was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24.)

## DISPOSITION

The judgment is affirmed.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

SUZUKAWA, J.

We concur:


EPSTEIN, P. J.


MANELLA, J.