Filed 5/31/13  P. v. Ceja CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G044737 |
| v. | (Super. Ct. No. 09CF2642) |
| MAURY ISRAEL CEJA, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Richard W. Stanford, Jr., Judge.  Affirmed in part and reversed in part.

Phillip I. Bronson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Peter Quon, Jr. and Christopher P. Beesley, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

A jury convicted Maury Israel Ceja of felon-in-possession of firearm ammunition (former Pen. Code, § 12316, subd. (b)(1) [now codified at Pen. Code, § 30305, subd. (a); all further undesignated statutory references are to this code]), active participation in a criminal street gang (§ 186.22, subd. (a)), and possession of drug paraphernalia (Health & Saf. Code, § 11364). Ceja argues his trial attorney rendered ineffective assistance of counsel by failing to object on confrontation grounds to DNA testimony by a prosecution expert who did not conduct the DNA tests on a baggie and bullets recovered from a jacket in Ceja's garage. He also challenges the sufficiency of the evidence to support his conviction for active gang participation, and he argues the introduction of some gang-related evidence was more prejudicial than probative. As we explain, controlling precedent requires us to reject Ceja's confrontation challenge without independently evaluating the merits of his claim. Controlling precedent also requires that we reverse his conviction for active gang participation because the evidence does not show he acted together with a fellow gang member to possess dozens of bullets the police recovered in his jacket. Consequently, we reverse the judgment as specified in the disposition, and affirm in all other respects.

I

FACTUAL AND PROCEDURAL BACKGROUND

Police conducting a parole search of Ceja's residence found gang paraphernalia in his bedroom and on his cell phone, and they found in his garage a jacket his size with a glass methamphetamine pipe and a baggie containing 74 rounds of .22-caliber ammunition in one of the pockets. By virtue of a previous felony conviction, Ceja was barred from possessing a firearm or ammunition. (Former §§ 12021, 12021.1,

now codified at §§ 29800, 29900, 30305, subd. (a); Welf. & Inst. Code, §§ 8100, 8103.) He denied knowledge of the bullets or methamphetamine pipe.

The police submitted the baggie of bullets to the Orange County Crime Lab (crime lab) for genetic testing and also submitted to the lab a buccal swab obtained from Ceja for testing. Juli Anne Buckenberger, a forensic DNA analyst at the lab and chair of the DNA Study Group for the California Association of Criminalists, supervised the genetic testing. She explained in her testimony that a buccal swab "is like a Q-tip and you rub it on the inside of your cheek, and it collects all kinds of cells. The data that's generated from that swab, which is known to come from a specific individual" is then "compared to something obtained from a crime scene" to determine if there is a match.

Buckenberger personally swabbed the baggie and each of the bullets to collect residual genetic material, if any, from persons who had touched the items. She explained: "In our laboratory, we do what's called touch DNA. . . . [¶] The technology is so sensitive [that] if someone [has] handle[d] the item, we are able to get a genetic profile from that DNA."

Buckenberger submitted Ceja's buccal swab and her swabs of the bullets and baggie to other analysts in the lab for DNA testing. She explained the division of labor for DNA testing in her laboratory operated "kind of . . . like doing the dishes. One person receives all the dishes. The next person is going to wash all the dishes. The next person is going to rinse them all. The next person will dry them all. And the next person puts them all away. That's kind of how we process the DNA."

More specifically, Buckenberger described the analysts' steps as follows: extraction of DNA from the unknown sample through "a process by which different chemicals are introduced to the sample" to "break the nucleus open and release the

3

DNA," while also "clean[ing] off any kind of extra cellular proteins, or any kind of what we call debris," followed by "quanititation," amplification, sequencing to develop a genetic profile, and determination of the frequency of the profile. The analysis required repeating these procedures for the known sample, and then comparing the genetic profile of the known sample with any found in the unknown sample. In more detail, Buckenberger explained that the second step in this process, quantitation, is "a procedure to determine how concentrated" the DNA is after extracting it. Buckenberger explained quantitation is "important" because "the next step, which is amplification, requires a pretty specific amount of DNA. If you put too much into the system, it won't work. If you put too little into the system, it won't work. You are looking for a specific amount of DNA."

According to Buckenberger, amplification "gets a little more complicated" than the previous step. She explained that "you can think of DNA as like a very, very long street" on which DNA analysts are "only interested in specific addresses." "So, what this amplification step does [is] it sends in certain molecular probes, and they look along the DNA until they find those specific areas. Once they find those areas, it starts making — you can think of it as Xerox copies, little molecular Xerox copies, millions and millions of copies of just these areas."

The final step of developing a genetic profile consists of sequencing these specific DNA strand portions "based on their size and . . . assign[ing] a numeric designation. So, what [an analyst] is left with at the end is a genetic profile. And that's the short version." Buckenberger elaborated: "[Y]ou can think of it as at each address or each location [analyzed], you're going to have a set of genetic markers, one from mom and one from dad. Once you look at all of — there are 13 that you look at, or 15,

4

actually. Once you look at the 15 addresses and get the specific type [of markers] at each one, when you look at it all together, that's the genetic profile." Buckenberger explained that the profile is represented by a pair of numbers at each of the 15 relevant addresses or locations along the DNA strand. She used Ceja's profile from his known sample to illustrate: "So, at this location, Mr. Ceja has 11, 13. That means he's got [marker] 11 from one parent [and marker] 13 from another parent. That's just a numerical designation for the genetic markers that we have at that location."

Buckenberger explained that once an analyst obtains a genetic profile from a sample, the next step is a "frequency estimate," which is "basically, a statistical value that we assign to how rare or how common a profile is" at each of the 15 relevant DNA strand locations. A crime lab analyst calculates the statistical frequency based on FBI studies located in an FBI database "that's in use, not only in [f]orensics, but other disciplines as well. They have actually studied the frequency. The frequency means how common or how rare these genetic types are. [¶] So, for each one of these genetic markers, at each of these locations, some of them are really rare and some of them are really common." Buckenberger illustrated: "For example, at the first location, Mr. Ceja has a 11, 13. So there's a specific frequency that's been calculated in the population for how many people . . . have this 11, 13. So, you take that frequency, you multiply it by the frequency of the next marker, and you do this 15 times . . . ." Multiplying the frequency figure at each of the 15 DNA strand locations captures mathematically how the frequency of each particular marker pair appearing in a given sample, in a particular order along the DNA strand, "gets infinitesimally smaller." In other words, "the frequency of finding those specific markers in that specific order, it is extremely, extremely rare."

5

After swabbing the bullets and baggie to collect any residual genetic material, Buckenberger did not perform any of the ensuing genetic testing. She explained her role at the crime lab as follows. "As the case manager, I review the case and I review the circumstances of the case. I talk to the detective, figure out what he or she wants, and I look at the evidence initially, and decide what items of evidence I'm going to examine, and which items I'm going to send off for further testing."

Buckenberger's role as case manager required her to supervise the DNA analysis process. She explained that she reviewed reports the DNA analysts generated for each of the steps they performed. She elaborated: "Every step along the way, when we talk about the short version of examining the evidence, extraction, a[mplif]ication, so on and so forth, at every step along the way there's documentation that's generated of what are called controls. All scientific process, if they are prudently done, use positive and negative controls. These are known samples to analyze the analytical process. It just shows all the chemicals are working the way they need to work, and the results we get from our unknown samples are reliable, because the results we put into our controls, or our known samples, have given us appropriate results." According to Buckenberger, the analysts were supposed to record the results of each laboratory process they performed "contemporaneously with each step . . . ."

Buckenberger did not testify she observed any of the analysts perform any of the steps in the process she described, nor did she testify she observed any of them perform any of the control procedures. Instead, she "reviewed all the data" the analysts produced, and drew on this data to "write the report at the end." It does not appear any particular data or reports the analysts may have produced were separately admitted at trial. The record gives no hint whether any of the data was reduced to forms or reports

6

that were in any manner certified or sworn. The parties do not say whether the written report Buckenberger produced was admitted at trial, let alone whether she swore to or in any manner certified the contents of her report when she reduced it to writing.

Buckenberger testified at trial that the crime lab's DNA analysis revealed Ceja's buccal swab yielded a unique genetic profile — one in a trillion, to be exact. In other words, the frequency estimate for the genetic marker pairs in Ceja's profile appearing at the 15 particular DNA strand locations was just one in a trillion. As Buckenberger put it, "That means it's really, really, really rare, extremely rare." Buckenberger testified that the DNA profile revealed in Ceja's buccal swab matched the DNA profile extracted from the genetic residue left on the baggie and on the bullets. The jury convicted him as noted,[1] and he now appeals.

II

DISCUSSION

A.    *Confrontation Clause*

Ceja contends his trial attorney rendered ineffective assistance of counsel by failing to object to Buckenberger's DNA testimony on confrontation grounds. Specifically, he contends his inability to cross-examine the laboratory technicians who produced the data on which Buckenberger relied in concluding there was a DNA match violated the Confrontation Clause. (U.S. Const., 6th Amend.) As Ceja phrases it, "The prosecution's failure to call these lab forensic scientists prevented the defense from

---

[1]    In a bifurcated proceeding, Ceja admitted a prior strike and serious felony offense and that he served three previous prison terms. The trial court imposed a nine-year sentence, consisting of a two-year midterm for the ammunition possession, doubled to four years under the Three Strikes law, plus five years for the prior serious felony conviction. The court imposed a concurrent sentence for the active participation in a street gang conviction, stayed sentencing on the drug paraphernalia conviction, and struck the prison priors for purposes of sentencing.

exploring the possibility that [they] 'lacked proper training or had poor judgment [and] from testing their honesty, proficiency and methodology.'" (Quoting *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305, 321 (*Melendez-Diaz*).)  Governing precedent requires that we reject Ceja's contention.

      1.      Ineffective Assistance of Counsel

      To obtain reversal based on ineffective assistance of counsel, the defendant must establish the attorney's performance was both objectively unreasonable and negatively affected the trial outcome.  (*Strickland v. Washington* (1984) 466 U.S. 668, 688.)  Consequently, defense counsel is not required to make futile objections or advance unmeritorious arguments.  (*People v. Cudjo* (1993) 6 Cal.4th 585, 615-616.)  As we explain, the confrontation challenge Ceja now asserts gains him no relief under controlling Supreme Court authority.  Accordingly, his attorney cannot be faulted for failing to make an objection destined to fail, and Ceja's ineffective assistance claim therefore falls short.

      2.      Confrontation Clause:  Governing Authority

      Ceja grounds his appellate challenge in the Confrontation Clause, the subject of intense scrutiny in the United States and California high courts in recent years, which we briefly summarize.  "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  (U.S. Const., 6th Amend.)  This clause precludes admission of "testimonial" out-of-court statements offered against a criminal defendant, unless the witness is unavailable at trial and the defendant had a prior opportunity for cross-examination.  (*Crawford v. Washington* (2004) 541 U.S. 36, 59 (*Crawford*).)  In *Crawford*, the court concluded an unconfronted statement made by

the defendant's wife in response to custodial interrogation was testimonial, and therefore its admission at trial violated the defendant's right to confront witnesses against him.

The *Crawford* court did not define the term "testimonial," and the United States Supreme Court still has yet to agree upon a definition. The court decided that, whatever the definition, a core class of formalized "testimonial" hearsay includes prior preliminary hearing or grand jury testimony (*Crawford*, *supra*, 541 U.S. at pp. 51, 68); statements made in response to police interrogations if there is no ongoing emergency and the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution (*Davis v. Washington* (2006) 547 U.S. 813, 822 (*Davis*); *Michigan v. Bryant* (2011) 562 U.S. ___, ___, 131 S.Ct. 1143, 1157); and sworn affidavits that are admitted in lieu of live testimony (*Melendez–Diaz*, *supra*, 557 U.S. at p. 310). Beyond this list, a majority of the justices of the United States Supreme Court has never agreed upon a formulation for determining which out-of-court statements are "testimonial." (See *People v. Dungo* (2012) 55 Cal.4th 608, 617 (*Dungo*); *People v. Holmes* (2012) 212 Cal.App.4th 431, 436-438.)

In *Melendez–Diaz,* the trial court admitted a chemical analyst's affidavit as a substitute for live testimony to prove an element of the drug trafficking offense: that the substance the defendant possessed was cocaine. Five justices, including Justice Thomas, agreed that the certification was "testimonial" because affidavits are within the core class of testimonial materials covered by the confrontation clause. (*Melendez–Diaz*, *supra*, 557 U.S. at p. 310.) Justice Thomas explained he joined the majority based on "my position that 'the Confrontation Clause is implicated by extrajudicial statements *only* insofar as they are contained in formalized testimonial

materials, such as affidavits, depositions, prior testimony, or confessions.'" (*Melendez–Diaz*, *supra*, 557 U.S. at p. 329, italics added (conc. opn. of Thomas, J.).)

Previously, in *People v. Geier* (2007) 41 Cal.4th 555 (*Geier*), our Supreme Court concluded no confrontation violation occurred when a forensics laboratory supervisor testified concerning DNA test results obtained by an analyst who did not testify. *Geier* rejected the reasoning of cases holding "various types of forensic evidence in the form of laboratory reports were testimonial because their primary purpose was to establish a fact at trial regarding the defendant's guilt of the charged crime. [Citations.]" (*Geier*, at p. 606.) Instead, *Geier* determined "the crucial point is whether the statement represents the contemporaneous recordation of observable events." (*Id*. at p. 607.)

Under this standard, and relying on cases finding that forensic reports, as business records, were nontestimonial, the court concluded the lab analyst's report and notes in *Geier* — recorded as she received, prepared, and analyzed the DNA samples — were not testimonial and therefore did not implicate the Sixth Amendment when her supervisor recounted them in her testimony. (*Geier*, *supra*, 41 Cal.4th at pp. 605–606, 607.) *Geier* discounted the prosecutorial purpose in having the lab conduct a DNA test on a sperm sample retrieved from a rape and murder victim, emphasizing instead the "'neutral'" nature of laboratory "protocols . . . and resulting raw data," which "'hav[e] the power to exonerate as well as convict.' [Citation.]" (*Id*. at p. 607.)

Notably, the plurality in *Melendez–Diaz* articulated several conclusions that would cast doubt on *Geier* if Justice Thomas had joined their analysis. First, the plurality rejected the *Melendez-Diaz* dissent's distinction that a "'conventional witness recalls events observed in the past, while an analyst's report contains near-contemporaneous observations of the test.'" (*Melendez–Diaz*, *supra*, 557 U.S. at p. 315.) The plurality

10

reasoned that in *Hammon v. Indiana*, a companion case decided in *Davis*, the trial court admitted a witness's statements as a "'present sense impression'" that was "near-contemporaneous" to the events she reported (*Davis*, *supra*, 547 U.S. at pp. 820, 830), but "we nevertheless held that they could *not* be admitted absent an opportunity to confront the witness." (*Melendez–Diaz*, at p. 316, original italics.)

Second, the plurality dismissed what it called the dissent's "license to suspend the Confrontation Clause" for "'neutral scientific testing'" as "little more than an invitation to return to our over-ruled decision in *Roberts* [*v. Ohio* (1980)] 448 U.S. 56, which held that evidence with 'particularized guarantees of trustworthiness' was admissible notwithstanding the Confrontation Clause." (*Melendez–Diaz*, *supra*, at pp. 317-318.) Third, the plurality dismissed reliance on the business records hearsay exception because such records, "having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial," are not testimonial, whereas "the analysts' statements here — prepared specifically for use at petitioner's trial — were testimony against petitioner," thus requiring an opportunity to confront the analysts. (*Id*. at p. 324.)

The high court returned to the confrontation issue in *Bullcoming v. New Mexico* (2011) 564 U.S. ___, 131 S.Ct. 2705. There, five justices agreed that a certified blood alcohol report prepared by a nontestifying lab analyst was testimonial. (*Id*. at pp. 2709, 2718-2719.) Justice Thomas was among them, but joined solely because the report included a signed "Certificate of Analyst," as he later explained in *Williams v. Illinois* (2012) 567 U.S. ___, 132 S.Ct. 2221, 2255, 2260 (*Williams*) (conc. opn. of Thomas, J.).

11

In *Williams*, five justices, including Justice Thomas, agreed that the uncertified results of a DNA analysis, performed by nontestifying laboratory analysts, were nontestimonial. (*Williams*, *supra*, 567 U.S. at p. ___, 132 S.Ct. at pp. 2226-2227 [defendant charged with rape].) Four justices also concluded the testifying expert's reliance on and disclosure of the nontestifying analysts' laboratory results showing a DNA match with the defendant amounted to proper expert testimony foundation. As a foundational predicate for other testimony, the DNA match result was not admitted for its truth, according to the four justices, but rather for the limited purpose of explaining the basis for the testifying analyst's opinion. (*Id.* at pp. 2264-2265, 2276-2277.) Justice Thomas rejected this rationale. (*Id.* at pp. 2256-2259 (conc. opn. of Thomas, J.).) Instead, he agreed (*ibid.*) with the four dissenting justices that "admission of the out-of-court statement in this context has no purpose separate from its truth; the factfinder can do nothing with it *except* assess its truth and so the credibility of the conclusion it serves to buttress." (*Id.* at p. 2269, original italics (dis. opn. of Kagan, J.).)

Justice Thomas concurred in the result in *Williams* solely because the uncertified report forming the basis for the expert's opinion lacked the "requisite 'formality and solemnity' to be considered" testimonial. (*Williams*, *supra*, 567 U.S. at p. ___, 132 S.Ct. at pp. 2255, 2260 (conc. opn. of Thomas, J.).) He reaffirmed he would not join in any definition of "testimonial" extending beyond "'"formalized testimonial materials,"'" such as depositions, affidavits, and prior testimony, or statements resulting from "'formalized dialogue'" such as custodial interrogation" (*ibid.*), based on his view

12

that the Confrontation Clause "regulates only the use of statements bearing 'indicia of solemnity'" (*id.* at p. 2259).[2]

The California Supreme Court has extracted two critical components from the "widely divergent" views of the United States Supreme Court justices. (*Dungo*, *supra*, 55 Cal.4th at pp. 616, 618, 619; *People v. Lopez* (2012) 55 Cal.4th 569, 581–582.) To be "testimonial," (1) the statement must be "made with some degree of formality or solemnity," and (2) its "primary purpose" must "pertain[ ] in some fashion to a criminal prosecution." (*Dungo*, at p. 619; *Lopez*, at p. 582.) Thus, the *Dungo* court recently concluded that factual observations by a nontestifying pathologist about the condition of a body, recorded in an unsworn autopsy report, were not testimonial because they lacked formality and the autopsy report had other purposes aside from criminal investigation. (*Dungo*, at p. 621.) And the *Lopez* court concluded a lab analyst's unsworn report analyzing machine-generated blood alcohol concentration data lacked the requisite degree of formality to be testimonial, and the court therefore did not consider the primary purpose of the report. (*Lopez*, at pp. 583-584.) In the third of the court's recent trilogy of confrontation cases, *People v. Rutterschmidt* (2012) 55 Cal.4th 650, 661, the court did not decide whether a lab analyst's report was testimonial because overwhelming evidence of guilt rendered any confrontation clause violation harmless beyond a reasonable doubt.

---

[2]     The dissenting justices complained Justice Thomas's formality-solemnity criterion "grants constitutional significance to minutia . . . ." (*Williams*, *supra*, 567 U.S. at p. ___, 132 S.Ct. at p. 2276.) They noted "(maybe) a nickel's worth of difference" between the laboratory analysis excluded in *Bullcoming* and the forensic report admitted in *Williams*, chiefly that "the report is not labeled a 'certificate.'" (*Ibid.*) According to the dissent, this "approach, if accepted, would turn the Confrontation Clause into a constitutional gee-gaw — nice for show, but of little value. The prosecution could avoid its demands by using the right kind of forms with the right kind of language. (It would not take long to devise the magic words and rules — principally, never call anything a 'certificate.')" (*Ibid.*) The dissent concluded, "It is not surprising that no other Member of the Court has adopted this position." (*Id.* at p. 2277.)

13

Under current California law, a statement is not testimonial unless both the formality and primary purpose criteria are met. In *Lopez*, the court concluded that lack of formality alone rendered the blood alcohol report nontestimonial regardless of its primary purpose. (*Lopez*, supra, 55 Cal.4th at p. 582.) In his dissent, Justice Liu pointed out that the United States Supreme Court has not adopted this analysis, and he argued that "the proper determination of a statement's formality for purposes of the confrontation clause is closely intertwined with the nature and purpose of the process that produced the statement." (*Id.* at p. 594 (dis. opn. of Liu, J.).) But the majority's opinion is controlling authority and we are compelled to follow it. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 (*Auto Equity*).)

3.    Analysis

Based on the foregoing, we must conclude Ceja's confrontation challenge fails for several reasons. First, *Geier* has never been overruled or disapproved. Thus, Buckenberger was entitled to testify concerning the DNA analysis she supervised though she "'didn't actually run the tests herself.'" (*Geier*, supra, 41 Cal.4th at p. 596; accord, *Lopez*, supra, 55 Cal.4th at p. 581 [noting skepticism in United States Supreme Court plurality opinions]; *Auto Equity*, supra, 55 Cal.4th at p. 455.)

Second, the extraction, quantitation, amplification, sequencing, profile analysis, and frequency determination data obtained by Buckenberger's analysts resembles the nontestifying pathologist's unsworn autopsy report "merely record[ing] objective facts" on which the testifying pathologist in *Dungo* relied. (*Dungo*, supra, 55 Cal.4th at p. 619.) While five justices in *Williams* explained that the general admissibility of material on which an expert relies does not defeat a confrontation objection (*Williams*, supra, 132 S.Ct. at pp. 2256-2257 (conc. opn. of Thomas, J.); *id.* at

14

pp. 2268-2272 (dis. opn. of Kagan, J.)), we are bound by our high court's decision in *Dungo*, which perceived no obstacle in *Williams*. (*Auto Equity*, *supra*, 55 Cal.4th at p. 455.)

Finally, Ceja does not suggest the analysts' laboratory results on which Buckenberger relied were in any manner formalized or bore indicia of solemnity that would make them testimonial under controlling law. It appears the results were just *data*. Even if the data's reliability depended to a degree on the nontestifying analysts' training, judgment, honesty, proficiency, or actual methodology — matters on which Ceja could not cross-examine them because only Buckenberger testified, the data was not in any manner certified like the "Certificate of Analyst" in *Bullcoming*, nor presented by an affidavit as in *Melendez-Diaz*. Whether these distinctions amount merely to magic words and rules as the dissent in *Williams* feared is not germane given the requirement of solemnity and formality in *Dungo* and *Lopez*. Accordingly, based solely on controlling precedent, we must conclude that the forensic analysis on which Buckenberger relied was not testimonial, and therefore Ceja's right to confront witnesses against him was not violated by its admission. (*Auto Equity*, *supra*, 55 Cal.4th at p. 455.)

B.     Gang Offense and Evidence

Ceja challenges the sufficiency of the evidence to support his conviction for active gang participation under section 186.22, subdivision (a). Ceja appears to assume the underlying felonious conduct (here, prohibited possession of ammunition) must be committed with an intent to further gang objectives. Accordingly, he argues the prosecution failed to present sufficient evidence his possession of the ammunition was gang related. He relies on the truism that gang members may commit offenses for

15

personal reasons, "on a frolic and detour unrelated to the gang." (*People v. Morales* (2003) 112 Cal.App.4th 1176, 1198 (*Morales*).)

*Morales*, however, is inapposite because the enhancement allegations alleged there (§ 186.22, subd. (b)) turned on proof of a benefit for the gang, and therefore required a gang purpose. (*Morales*, *supra*, 112 Cal.App.4th at p. 1198.) The substantive gang offense (§ 186.22, subd. (a)) is different. Our Supreme Court has determined that the "felonious criminal conduct" underlying a conviction for active gang participation need not be gang related, but instead supports a substantive gang offense conviction if it is committed by active gang participants who know of their gang's criminal activities. (*People v. Albillar* (2010) 51 Cal.4th 47, 54-59; *Auto Equity*, *supra*, 57 Cal.2d at p. 455.)

Ceja nevertheless stumbles into relief by observing there was no evidence *anyone* else knew of his prohibited possession of the ammunition, let alone any fellow gang members. The Supreme Court has determined a gang member acting alone, even on behalf of his gang, does not commit the offense of active gang participation because it applies to "'felonious criminal conduct by *members* of that gang.'" (*People v. Rodriguez* (2012) 55 Cal.4th 1125, 1130, 1132 ["'[M]embers' is a plural noun"], italics added.) We therefore reverse Ceja's conviction for active gang participation in count 2.

This moots Ceja's related claim. He argues evidence of his previous conviction for possessing a switchblade knife for the benefit of a gang should have been excluded as more prejudicial than probative. (Evid. Code, § 352.) The prosecution's gang expert relied on the prior conviction for his opinion Ceja was an active member in his gang, over Ceja's objection. Whatever the merits of Ceja's objection, which we need not decide, reversal of his gang conviction moots the question. The prosecutor did not allege a gang enhancement, nor did any gang evidence pose any possible prejudice to

16

Ceja on the count concerning ammunition possession. Simply put, the DNA evidence conclusively established he possessed the bullets, mooting any possibility the jury might impermissibly infer from the gang evidence a bad character tendency to possess ammunition. And given the DNA evidence concerning the bullets, it is unlikely the jury would conclude the methamphetamine pipe recovered in the same jacket pocket belonged to anyone besides Ceja. Accordingly, we cannot say admission of Ceja's prior gang conviction prejudiced him on the bullet or pipe possession counts remaining after reversal of his conviction for active gang participation.

III

DISPOSITION

We reverse Ceja's conviction in count 2 for active gang participation (§ 186.22, subd. (a)), and direct the trial court to forward an amended abstract of judgment to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.


ARONSON, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


IKOLA, J.

17
