Filed 12/19/24  P. v. Sims CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>CHRISTOPHER SIMS,<br><br>    Defendant and Appellant. | A167809<br><br>(San Francisco County<br>Super. Ct. Nos. SCN 232252,<br>CRI 19015556) |

A jury convicted defendant Christopher Sims of burglary and numerous other felony offenses arising from a home invasion committed by masked gunmen.  Sims contends his Sixth Amendment right to confront witnesses was violated when an expert witness testified about his own analysis of DNA evidence that connected Sims to the crime scene.  Sims also argues there was insufficient evidence to support his convictions.

We find no error and affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

By consolidated information filed in August 2020, the San Francisco District Attorney charged Sims and codefendant Elias Walker with first degree residential burglary, multiple counts of first degree robbery and

assault with a semiautomatic firearm, and additional offenses.[1] Many enhancements were alleged, including that Sims personally used a firearm in committing the offenses. At the jury trial, the prosecution presented evidence of the following.

*The Home Invasion*

In May 2017, an extended family of Juana M., Daniel M., Antonia R., Steven M., and Gabriella A. lived in a house in San Francisco. Juana, Daniel, and Antonia shared a room, and Steven and Gabriella lived in another room.

The night of May 21, 2017, Juana, Antonia, and Daniel were in their room. Juana was in bed when she "heard our door getting kicked in and it was a man dressed in black holding some type of weapon." The man wore a ski mask, and his weapon was "much bigger" than a handgun, "almost like . . . a machine gun."[2] He took Daniel's computer and Antonia's cell phone. The man "pointed the gun in front of [Juana's] face," and she gave him her phone.

Steven and Gabriella came home as the home invasion was in progress. Steven opened the front door and saw men in ski masks with guns. Gabriella was behind Steven. When she saw a masked man with a gun in the house, Gabriella turned around and ran away. She ran down the street and called the police. Steven was forced to lie down on the kitchen floor, and his wallet,

---

[1] Codefendant Walker was also convicted of burglary and multiple additional offenses in connection with the home invasion, and this court affirmed the judgment in Walker's case in *People v. Walker* (May 22, 2024, A166719) (nonpub opn.) 2024 WL 2312294.

[2] Juana described the gun as having "like a box below it"; she agreed the gun had "a magazine under it."

keys, phone, and everything in his pockets were taken from him. He was hit in the head with "something very hard" and saw blood in his eyes.

*Police Response*

Around 10:55 p.m., police were dispatched to the house on a report of a home invasion. Officers entered the house and announced themselves, shouting, "SFPD." Meanwhile, three other officers went to the backyard of a neighboring house to observe the back of the victims' house. After police announced themselves at the victims' house, the officers in the neighboring backyard saw the back door of the victims' house burst open. A suspect in a ski mask came running out and began firing toward the officers in the neighboring yard. The shooter went over the rear fence of the victims' backyard. Officers saw one or two additional suspects run out of the house following the shooter.[3]

Soon after the shots were fired, an officer apprehended Sims as he "c[a]me running through the bushes" on the street behind the victims' house. Sims was not wearing a mask or hat, and he did not have any weapons when he was arrested.

*Police Investigation*

San Francisco police officers found a Glock 26 pistol with a high-capacity magazine in the kitchen of the victims' house and multiple shell casings in the backyard. Officers searched neighboring backyards and found a sock hanging on a fence between backyards. Further down the block, an officer found an empty tire with a sock that appeared to match the sock found

---

[3] One officer testified he saw "two people" come out of the back of the victims' house. Another officer saw three suspects run out of the back of the house—the shooter and then two more individuals.

on the fence, a Glock 17 pistol, and a black ski mask "inside the well of the tire."

The police recovered surveillance video taken on the street behind the victims' house near where Sims was arrested. The video showed a car pull up and park on the street behind the victims' house. Two individuals got out of the car, and one appeared to be carrying a handgun with an extended magazine. No one returned to the car, but about 15 minutes after parking, the car drove off, suggesting the driver had remained in the car.

Tool marks on the casings recovered from the victims' backyard were consistent with being fired from the Glock 17 pistol found in the tire down the block.

*DNA Evidence*

Criminalist Kimberly Wong testified as an expert in DNA analysis. Wong explained that DNA evidence is processed in "a batch way" at the San Francisco Crime Laboratory, meaning "different analysts may be performing different steps of [a] case at any time." Wong described the four steps that occur before DNA evidence can be analyzed: (1) extraction, which involves "adding chemicals or reagents to the swab" resulting in a "DNA extract," (2) quantitation, which is estimating how much DNA is present in the DNA extract, (3) amplification, which is using polymerase chain reaction to "make many copies of DNA," and (4) detection, which involves use of an instrument that "detects the many different locations on the DNA" and produces a graph called an electropherogram. Once there is an electropherogram, "the next step is to interpret the data," which is when a criminalist uses her "knowledge and [her] experience to determine whether the sample is single source, meaning there's only one contributor, or if it's a mixture, if there's

4

more than one contributor" and, if possible, the criminalist develops "a major or minor profile." This final step is the analysis of the DNA evidence.

In 2017, Wong analyzed DNA evidence from swab samples taken from the grip area and trigger of the Glock 26 found in the victims' house, the high-capacity magazine found in the victims' house, and the Glock 17 and ski mask found in the tire down the block.

As to the DNA evidence from the Glock 26 and the high-capacity magazine found in the kitchen of the victims' house and the Glock 17 in the tire down the block, Wong determined there were multiple contributors, and she was unable to interpret the evidence further because of the complexity of the mixtures. Wong determined there were at least four contributors to the DNA mixtures from the Glock 26 and the high-capacity magazine and at least three contributors to the DNA mixture from the Glock 17. As to the DNA evidence from the ski mask, Wong was able to interpret "a single major DNA profile present." Wong was provided a reference DNA sample from Sims, and she was able to *exclude* Sims as the major contributor.[4] Two reports that Wong wrote documenting her analysis and conclusions (prepared in July and December 2017) were admitted into evidence.

Criminalist Alain Oyafuso testified as an expert in forensic DNA analysis with STRmix. He explained that STRmix is a computer "program that utilizes probabilistic genotyping," which "is a method through the use of software that aids in DNA interpretation and also giving statistical weights." He testified that STRmix is "capable of analyzing mixtures of up to four

---

[4] Later the same year, Wong received a DNA sample from codefendant Walker, and she determined Walker was *included* as a possible major contributor to the ski mask DNA evidence with a random match probability of one in at least 562 octillion.

contributors" where previously "it was really, really rare to try to attempt that." The San Francisco Police Department Crime Lab began using STRmix in 2018.

In 2019, Oyafuso was asked to use STRmix to compare Sims's and Walker's reference DNA samples with the DNA evidence from the Glock 26 and the high-capacity magazine found in the victims' house and the Glock 17 found in the tire. (He was not asked to analyze evidence related to the ski mask.) Oyafuso explained that he "didn't do any of the DNA processing"; he did "the analysis portion," which meant he first reviewed the "output from the instruments" (the electropherograms) to determine the number of contributors in each of the DNA mixtures obtained from the evidence and then "input the data into STRmix." In using STRmix, he assumed the evidence from the firearms and magazine were mixtures of DNA from four contributors including at least two males.

For the DNA evidence from the Glock 26 found in the victims' house, the STRmix result showed "very strong support for the proposition" that Sims was a contributor to the DNA mixture.[5] For the DNA evidence from the Glock 17 and the high capacity magazine, the results were "very strong support for the proposition" that Sims was not a contributor to either of the

---

[5] Oyafuso explained that he would propose a hypothesis (such as "person X [with a known DNA profile] is a contributor to the sample"), and STRmix would generate a likelihood ratio. For the proposition that Sims contributed to the DNA mixture from the Glock 26, the STRmix analysis was that "[t]he likelihood of obtaining these DNA results is at least 34.6 septillion times greater if the DNA originated from Mr. Sims and three unrelated persons from the general U.S. population than if from four random unrelated persons from the U.S. population."

DNA mixtures.[6]  A report that Oyafuso wrote in March 2019 documenting his analysis and conclusions was admitted into evidence.

*Jury Verdict and Sentence*

The jury found Sims guilty of burglary (Pen. Code,[7] § 459; count 7); four counts of first degree robbery in concert (§§ 211, 213, subd. (a)(1)(A); counts 8 [Steven], 11 [Antonia], 14, [Daniel], and 16 [Juana]); four counts of assault with a semiautomatic firearm (§ 245 subd. (b); counts 9 [Steven], 17 [Antonia], 18 [Daniel], 20 [Juana]); assault with force likely to cause great bodily injury (§ 245, subd. (a)(4); count 10 [Steven]; and attempted criminal threats (§§ 664, 422; lesser included offense of count 13 [Steven]).[8]  As to the offenses other than the four assaults with a semiautomatic firearm, the jury found true the allegation that Sims personally used a firearm.

The trial court sentenced Sims to 16 years, four months in prison.

## DISCUSSION

A.    *Oyafuso's Testimony*

Sims contends his Sixth Amendment right to confront witnesses was violated when Oyafuso testified "based on testing done by a non-testifying

---

[6] For codefendant Walker, the STRmix results were "moderate support for the proposition" that Walker was a contributor to the DNA evidence from the Glock 26; "strong support for the proposition" that Walker was a contributor to the DNA evidence from the Glock 17; and "very strong support for the proposition" that Walker was not a contributor to the DNA evidence from the high-capacity magazine.

[7] Further undesignated statutory references are to the Penal Code.

[8] Counts 1 through 6 were alleged against codefendant Walker only.  As to count 12 (charge of inflicting injury on an elder, Antonia), the trial court granted Sims's motion for acquittal.  The jury found Sims not guilty of counts 15 and 19 (charges related to Gabriella).

witness about which Oyafuso had no personal knowledge." (Capitalization omitted.) We find no confrontation clause violation.

1. The Sixth Amendment Right to Confront Witnesses

"The Sixth Amendment's Confrontation Clause guarantees a criminal defendant the right to confront the witnesses against him." (*Smith v. Arizona* (2024) 602 U.S. 779, 783 (*Smith*).) "In operation, the Clause protects a defendant's right of cross-examination by limiting the prosecution's ability to introduce statements made by people not in the courtroom." (*Id.* at pp. 783–784.) The confrontation clause "applies in full to forensic evidence. So a prosecutor cannot introduce an absent laboratory analyst's testimonial out-of-court statements to prove the results of forensic testing." (*Id.* at p. 783.)

But the confrontation clause " 'applies only to testimonial hearsay,' " which imposes two limits to its scope. (*Smith*, *supra*, 602 U.S. at p. 784.) First, the evidence must be "testimonial," and, second, it must be hearsay. (*Id.* at pp. 784–785.)

"[T]o be testimonial the out-of-court statement must have been made with some degree of formality or solemnity." (*People v. Lopez* (2012) 55 Cal.4th 569, 581 (*Lopez*), citing *Crawford v. Washington* (2004) 541 U.S. 36, 51, and *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305, 310.) "Generally speaking, a . . . statement is testimonial if made 'with a primary purpose of creating an out-of-court substitute for trial testimony.' " (*People v. Fayed* (2020) 9 Cal.5th 147, 168, quoting *Michigan v. Bryant* (2011) 562 U.S. 344, 358.) For example, when "[a]n accuser . . . makes a formal statement to government officers," the statement is testimonial. (*Crawford*, *supra*, 541 U.S. at p. 51.) Affidavits are testimonial, and the United States Supreme Court has held that a " 'certificate[] of analysis' " is a testimonial statement where the certificate states a forensic analyst's conclusion that a substance is

8

an illegal drug and the certificate has been sworn to by the analyst. (*Melendez-Diaz*, *supra*, 557 U.S. at pp. 308, 310.)

On the other hand, our Supreme Court has held that less formal statements, such as notations in an unsigned lab report, do not qualify as testimonial. In *Lopez*, criminalist John Willey "testified that he had reviewed a laboratory report by his colleague, Jorge Peña, who had analyzed [the] defendant's blood sample"; the report concluded the defendant's blood sample had a blood-alcohol concentration of 0.09 percent, and Willey testified, "based on his own 'separate abilities as a criminal analyst,' [that] he too concluded that the blood-alcohol concentration in defendant's blood sample was 0.09 percent." (*Lopez*, *supra*, 55 Cal.4th at p. 574.) Our high court concluded the relevant "portions of that report were not made with the requisite degree of formality or solemnity to be considered testimonial." (*Id*. at pp. 582.) For example, the court reasoned that a notation in the lab report linking the defendant to the blood sample was "nothing more than an informal record of data for internal purposes," which was "not prepared with the formality required by the high court for testimonial statements." (*Id*. at p. 584; see also *Melendez-Diaz v. Massachusetts*, *supra*, 557 U.S. at p. 311, fn. 1 ["we do not hold, and it is not the case, that anyone whose testimony may be relevant in establishing the chain of custody, authenticity of the sample, or accuracy of the testing device, must appear in person as part of the prosecution's case"].)

To be hearsay, the out-of-court statement must be made by a person. The *Lopez* court further held that the portion of the lab report that consisted solely of "data generated by a gas chromatography machine" did not implicate the confrontation clause because such machine-generated results were not the statements of a person. (*Lopez*, *supra*, 55 Cal.4th at p. 583 [pages of lab report consisting of such data contained "no statement by Peña, express or

implied"].) The court "agree[d] with those federal appellate courts that have upheld the use of [machine-generated] printouts. (See *U.S. v. Moon* (7th Cir. 2008) 512 F.3d 359, 362 ['the instruments' readouts are not "statements," so it does not matter whether they are "testimonial" ']; *U.S. v. Washington* (4th Cir. 2007) 498 F.3d 225, 231 ['the raw data generated by the machines do not constitute "statements," and the machines are not "declarants" ']; see also *Bullcoming* [*v. New Mexico* (2011) 564 U.S. 647, 673] (conc. opn. of Sotomayor, J.) [the prosecution's introduction only of 'machine-generated results, such as a printout from a gas chromatograph,' may not violate the defendant's confrontation right].)" (*Lopez*, at p. 583.) Our high court explained, "Because, unlike a person, a machine cannot be cross-examined, here the prosecution's introduction into evidence of the machine-generated printouts shown in pages two through six of nontestifying analyst Peña's laboratory report did not implicate the Sixth Amendment's right to confrontation." (*Ibid.*; accord *People v. Banks* (2014) 59 Cal.4th 1113, 1168 [citing *Lopez* and finding no confrontation clause violation where a witness testified about her own analysis of "the X-ray film output of a DNA test," which had been prepared by a nontestifying analyst], abrogated on another point by *People v. Scott* (2015) 61 Cal.4th 363, 391, fn. 3.)

    2.    <u>Analysis</u>

Here, Sims acknowledges that Oyafuso conducted his own independent analysis of machine-generated DNA data in the form of electropherograms. As Oyafuso explained, he did "the analysis portion," analyzing "the results that come out after the DNA samples are run on the instruments." He described the electropherograms as "peaks on a graph." The machine-generated electropherograms are not the statements of a person, and Oyafuso's reliance on them in reaching his own conclusions does "not

implicate the Sixth Amendment's right to confrontation."  (*Lopez, supra*, 55 Cal.4th at p. 583.)

In addition, we agree with the Attorney General that the electropherograms (and any attendant notations linking the data to either the evidence found at the crime scene or Sims) were not made with the requisite degree of formality to be considered testimonial.  (See *Lopez, supra*, 55 Cal.4th at p. 582.)  As the Attorney General argues, the preliminary data produced in the lab, including the electropherograms, were "unsworn and informal, intended for later analysis and were not meant to substitute [for] in-court testimony."

Sims relies on *People v. Ogaz* (2020) 53 Cal.App.5th 280 (*Ogaz*), but the case does not support his claim.  In *Ogaz*, forensic scientist Michelle Stevens conducted drug testing of substances recovered from the defendant, prepared a one-page report of her "analytical results and interpretations" in which she stated that the substances contained heroin and methamphetamine, and signed the report.  (*Id*. at p. 285, capitalization omitted.)  At trial, the report was admitted into evidence, although Stevens did not testify.  Instead, Stevens's supervisor, Thomas Dickan, who had reviewed and initialed the report, testified about the report and its contents.  (*Ibid*.)  The Court of Appeal held this violated the defendant's right to confront witnesses, concluding Stevens's report was a testimonial statement.  (*Id*. at pp. 286, 292.)

The *Ogaz* court distinguished Stevens's report from the lab report in *Lopez*, noting that Stevens signed her report, "demonstrat[ing] she was willing to stand behind the information reflected therein."  (*Ogaz, supra*, 53 Cal.App.5th at p. 291.)  The court also found a "distinguishing feature of Stevens's report is that it is not comprised primarily of machine generated

11

data, as in *Lopez*," but rather the report "contain[ed] the substantive conclusions Stevens reached as a result of the testing she conducted, which is precisely what she would have been expected to testify about had she appeared at trial." (*Ogaz,* at p. 291.)

The court further observed that there would have been no "problem if Dickan had formulated his own independent opinions based on the data that Stevens produced during the testing process." (*Ogaz, supra,* 53 Cal.App.5th at p. 293.) In other words, Stevens's testimony would not have been necessary if Dickan had conducted independent analysis of the data. "But," the court continued, "this [wa]s not a situation where an expert witness reviewed the work of another analyst and came to his or her own conclusion about the matter at hand. (Cf. *Lopez, supra,* 55 Cal.4th at []p. 587 (conc. opn. of Werdegar, J.) ['The demands of the confrontation clause were properly satisfied in this case by calling a well-qualified expert witness to the stand . . . who could testify to the means by which the critical instrument-generated data was produced and could interpret those data for the jury, giving his own, independent opinion as to the level of alcohol in defendant's blood sample.']; *People v. Barba* (2013) 215 Cal.App.4th 712 [expert witness independently drew conclusions from test results obtained by another worker in her lab]; *People v. Steppe* (2013) 213 Cal.App.4th 1116 [lab's technical reviewer gave her own independent opinion based on testing performed by another technician]; *People v. Huynh* (2012) 212 Cal.App.4th 285, [medical expert witness formed her own independent opinions from photographs taken by coworker and did not relay the opinions of her coworker to the jury]; *People v. Holmes* [(2012)] 212 Cal.App.4th 431 [expert witnesses reached their own conclusions based on testing data generated by other analysts].)" (*Ogaz,* at p. 293.)

12

The present case is easily distinguished from *Ogaz*. In *Ogaz*, the scientist who analyzed the evidence wrote a report about her conclusions, and the report was admitted into evidence even though she did not testify. Here, the reports that were admitted into evidence were prepared by Oyafuso and Wong, who both testified at trial. The electropherograms on which Oyafuso relied were "machine generated data," and the only "substantive conclusions" were those Oyafuso himself reached as a result of the analysis he conducted, which is precisely what he did testify about at trial. (Cf. *Ogaz*, *supra*, 53 Cal.App.5th at p. 291 [Stevens's report was "not comprised primarily of machine generated data," and contained "substantive conclusions Stevens reached as a result of the testing she conducted, which is precisely what she would have been expected to testify about had she appeared at trial"].) And there is no question that Oyafuso "formulated his own independent opinions based on the data that [another criminalist] produced during the testing process." (*Id*. at p. 293.) In *Ogaz*, the court found the testifying witness Dickan was "a 'mere conduit' for Stevens's opinions" (*ibid*.) but in this case, Oyafuso was the only criminalist who held the opinion that Sims likely contributed to the DNA evidence from the Glock 26, and he reached his opinion based on his own analysis.

In short, while Sims's argument suggests that every criminalist involved in the processing of forensic evidence must testify to comport with the confrontation clause, neither *Lopez* nor *Ogaz* supports his position.[9] We

---

[9] To the contrary, in *Lopez*, a lab assistant, Brian Constantino, "prepared the [blood] sample for testing," and "a second analyst, Jorge Peña, prepared the sample and conducted a blood-alcohol analysis by means of a gas chromatograph." (*Lopez*, *supra*, 55 Cal.4th at p. 598 (dis. opn. of Liu, J.).) Yet, our high court found no confrontation clause violation although neither Constantino nor Peña testified. (*Id*. at pp. 574, 584.)

conclude the admission of Oyafuso's testimony did not violate Sims's right to confront witnesses.[10]

B.  *Sufficiency of the Evidence*

Next, Sims contends the evidence was insufficient to support his convictions.  We disagree.

1.  Standard of Review

"To assess the evidence's sufficiency, we review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime or special circumstances beyond a reasonable doubt. [Citation.]  The record must disclose substantial evidence to support the

---

[10] In his opening brief, Sims's argument regarding Oyafuso's testimony is under the single heading, "Appellant's Sixth Amendment confrontation rights were violated by Oyafuso's testimony which was based on testing done by a non-testifying witness about which Oyafuso had no personal knowledge." (Capitalization omitted.)  California Rules of Court, rule 8.204(a)(1)(B) requires each party to "[s]tate each point under a separate heading or subheading summarizing the point."  "This is not a mere technical requirement; it is 'designed to lighten the labors of the appellate tribunals by requiring the litigants to present their cause systematically and so arranged that those upon whom the duty devolves of ascertaining the rule of law to apply may be advised, as they read, of the exact question under consideration, instead of being compelled to extricate it from the mass.' " (*In re S.C.* (2006) 138 Cal.App.4th 396, 408.)  "Failure to provide proper headings forfeits issues that may be discussed in the brief but are not clearly identified by a heading." (*Pizarro v. Reynoso* (2017) 10 Cal.App.5th 172, 179.)

To the extent Sims also intended to raise a separate claim of state law evidentiary error on the ground the electropherograms were inadmissible hearsay, we may deem the argument forfeited because he failed to identify the claim in a heading or subheading in his opening brief.  But, in any event, the electropherograms are not the statement of a person and, therefore, are not hearsay. (*Lopez, supra,* 55 Cal.4th at p. 583.)  "Simply put, '[t]he Evidence Code does not contemplate that a machine can make a statement.' " (*People v. Goldsmith* (2014) 59 Cal.4th 258, 274.)

14

verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. . . . We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence.' " (*People v. Zamudio* (2008) 43 Cal.4th 327, 357 (*Zamudio*).) "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the . . . verdict." (*Ibid*.)

" 'Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence.' " (*People v. Brooks* (2017) 3 Cal.5th 1, 57.) "The same standard [of review] governs in cases where the prosecution relies primarily on circumstantial evidence. . . . 'Although it is the [fact finder]'s duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the [fact finder], not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt.' " (*Zamudio, supra*, 43 Cal.4th at pp. 357–358.)

" ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment." ' [Citations.] 'Circumstantial evidence may be sufficient to connect a defendant with the crime and to prove his guilt beyond a reasonable doubt.' " (*People v. Bean* (1988) 46 Cal.3d 919, 933, 934 [rejecting a claim of insufficiency of the evidence for a murder conviction where the only evidence was that a pair of sunglasses bearing the defendant's fingerprints

15

was found next to the victim's body and that the defendant lived nearby and had been seen observing the victim's house in the past].)

    2.    <u>Analysis</u>

Here, surveillance video showed that three individuals arrived together on the street behind the victims' house and one of the individuals was seen carrying a handgun with an extended magazine. The testimony of the victims and police officers at the scene established that two or three masked gunmen invaded the victims' home and robbed and assaulted them.[11] Within minutes after the perpetrators were seen fleeing through the back of the victims' house, Sims was found emerging from the bushes on the street behind the victims' house (near where the car was previously parked). The perpetrators left a Glock 26 in the victims' house, and Sims's DNA was found on the firearm. The circumstances that Sims was found coming out of the bushes near the victims' house immediately after the home invasion, together with his DNA being found on a weapon used in the home invasion, provide substantial circumstantial evidence that Sims was one of the perpetrators and that he used the firearm in committing the crimes in the victims' house.

In challenging the sufficiency of the evidence, Sims argues that Oyafuso's testimony about the DNA from the Glock 26 was unreliable. He points out that Oyafuso testified that he "assumed" there were four contributors to the DNA mixture from the Glock 26 in conducting the STRmix analysis, and that "in reality no one knows the true number of any

---

[11] Juana testified she could hear "two or three people that were talking amongst themselves." Steven was not sure how many masked gunmen "rushed" him and "laid [him] down on the kitchen floor," but he testified, "it was more than one" person. One officer saw two suspects flee from the back of the victims' house, while another officer saw three suspects run out of the house.

16

number of contributors.  It's one of those things where you come up with your answer or what you think is the answer based on the data that's in front of you."[12]  Sims also cites cross-examination in which defense counsel questioned the correctness of Oyafuso's determination that there were four contributors to the Glock 26 DNA mixture.  For example, Oyafuso agreed that some of the peaks on the electropherograms for the DNA mixture from the Glock 26 were below the "stochastic threshold," which meant he "could be missing information."

But " '[c]onflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.' " (*Zamudio*, *supra*, 43 Cal.4th at p. 357.)  "The weight to be given to the opinion of a witness is a question of fact for the jury.  The jury are the exclusive judges of the credibility of witnesses," and this "rule applies to expert witnesses." (*People v. Loop* (1954) 127 Cal.App.2d 786, 800.)  In this case, it was for the jury to assess the credibility and reliability of Oyafuso's testimony.[13]

---

[12] However, Oyafuso went on to testify that the data supported his determination that there were four contributors to the DNA mixture and that he had not seen evidence to support a conclusion that there were five contributors to the DNA mixture.

[13] Notably, Sims does not challenge the reliability of STRmix as a method of analyzing DNA evidence.  (See *People v. Davis* (2022) 75 Cal.App.5th 694, 717, 722 [concluding "the STRmix method has gained general acceptance within the relevant scientific community" and noting, "Disputes about the accuracy, reliability, or validity of a testing method 'provide grist for adversarial examination, not grounds for exclusion.' "].)

Sims also argues that the presence of his DNA on the Glock 26 does not establish his presence at the scene at the time of the incident. He suggests the DNA could have been deposited on the firearm days or years earlier. This argument ignores the fact that he was found emerging from the bushes behind the victims' house after the perpetrators fled through the back of the house. Evidence of Sims's presence near the crime scene within minutes of the home invasion *coupled* with the evidence that his DNA was on a firearm found inside the house provides sufficient evidence that he was inside the victims' house during the home invasion.

Finally, Sims claims his presence near the victims' house and the fact that his DNA was found on the Glock 26 do not support a finding that he participated in or aided and abetted the crimes. He asserts the evidence established "three men were in the house, but the testimony supported only that two of the men participated in the assaults and robberies inside the house." We are not persuaded. The surveillance video showing three individuals arriving together and Juana's and Steven's testimony about the actions of the perpetrators provide sufficient evidence that the three men who entered the victims' house were acting together with an intent to rob the victims.

## DISPOSITION

The judgment is affirmed.

_____

Miller, J.

WE CONCUR:


_____

Stewart, P. J.


_____

Richman, J.


A167809, *People v. Sims*

19